**COMMONWEALTH of Pennsylvania,
Appellee**

v.

**Anthony ABRUE, Appellant.**

Superior Court of Pennsylvania.

Submitted July 14, 2008.
Filed Oct. 25, 2010.
Reargument Denied Dec. 29, 2010.

Karl Baker, Public Defender, Philadelphia, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: GANTMAN, DONOHUE, JJ., and McEWEN, P.J.E.

OPINION BY DONOHUE, J.:

Anthony Abrue ("Abrue") appeals from the judgment of sentence dated September 4, 2007 following his conviction on charges of simple assault [18 Pa.C.S.A. §§ 2701] and resisting arrest [18 Pa.C.S.A. §§ 5104]. In a prior memorandum decision, this Court denied all of the issues raised in Abrue's direct appeal. After granting Abrue's petition for allowance of appeal, however, our Supreme Court vacated this Court's order insofar as it disposed of his contention that the trial court's evidentiary decisions violated his constitutional rights under the Confrontation Clause in the Sixth Amendment to the United States Constitution. Our Supreme Court instructed that we consider on remand the Confrontation Clause claim in light of its decision in *Commonwealth v. Allshouse,* 604 Pa. 61, 985 A.2d 847 (2009). Having performed a review in light of *Allshouse* and the United States Supreme Court's decisions from which it emanates, we reverse the judgment of sentence and remand to the trial court for further proceedings consistent with this decision.

On May 9, 2007, while in a holding cell on charges unrelated to the current appeal, Abrue became engaged in an altercation with police officer Vincent Maroney ("Officer Maroney"). As a result of the incident, Abrue was charged with, *inter alia,* simple assault and resisting arrest.[1] Abrue waived his right to a jury trial. At the bench trial, the Commonwealth presented a single witness, Officer Lee Ellingsworth ("Officer Ellingsworth"). In the Commonwealth's case-in-chief, Officer Ellingsworth testified that he heard a commotion in the cell block area and went to

---

1. Abrue was also charged with aggravated assault and recklessly endangering another person, but the trial court subsequently dismissed these additional charges.

investigate, at which time he discovered his partner, Officer Maroney, being choked by Abrue. Notes of Testimony ("N.T."), 9/4/07, at 9–10. Officer Ellingsworth further testified that he struck Abrue in the torso to free his partner from Abrue's embrace, and that Abrue was then restrained and returned to the holding cell. *Id.* at 12. Neither officer sought medical attention for their injuries or missed any work as a result thereof. *Id.* On cross-examination, Officer Ellingsworth admitted that he did not see how the struggle between Officer Maroney and Abrue began. *Id.* at 13.

The Commonwealth rested its case, at which time Abrue took the stand to testify in his own behalf. Abrue testified that he asked Officer Maroney for a phone, but Officer Maroney refused to provide him with one and walked away. *Id.* at 16. Becoming upset, Abrue testified that he began rattling the bars of the holding cell. *Id.* According to Abrue, Officer Maroney returned and moved Abrue to another holding cell, at which time Abrue again demanded the use of a phone. *Id.* at 17. Abrue testified that Officer Maroney then said, "I'm not giving you no F-ing phone call, do you want me to kill you?," and proceeded to punch Abrue in the left eye with a closed fist. *Id.* at 18–19. Abrue contended that in self-defense he grabbed Officer Maroney's hands and the two began to tussle in the cell until Officer Ellingsworth arrived and both officers then proceeded to beat him. *Id.* at 19. Abrue denied that he ever struck Officer Maroney or put his hands around the officer's neck. *Id.* at 19. Abrue testified that he suffered bruises to the face and shoulder, but was not offered medical treatment. *Id.* at 20.

At the conclusion of Abrue's testimony, his counsel moved for immediate dismissal of the charges on the ground that Abrue

had asserted a claim of self-defense and that the Commonwealth (with the burden of proof) had no witness to rebut it (since Officer Ellingsworth admitted that he did not see how the altercation began). *Id.* at 27. Over defense counsel's objections, the trial court permitted the Commonwealth to recall Officer Ellingsworth as a rebuttal witness to testify regarding what Officer Maroney told him about the start of the fight. *Id.* at 28. After the trial court permitted both counsel to question Officer Ellingsworth regarding the circumstances of the exchange between the two officers, the trial court ruled that Officer Maroney's statements were excited utterances and thus admissible pursuant to Pa.R.E. 803(2). *Id.* at 36. Officer Ellingsworth then testified, again over defense counsel's objection, as follows:

Q. Officer Ellingsworth, what did Officer Maroney tell you happened prior to you getting there?

A. He told me that [Abrue] was in another cell shaking the ventilation ducts. He's reaching up and pulling on the ducts, trying to rip them down. What he was trying to do was move him from one cell to another cell that had the plastic on it so he couldn't do no damage to any of the city property, to the ventilation system.

Q. Did he tell you what happened when he was moving him from another cell to the cell?

A. He just said he turned and the guy—he had him and grabbed him and he was escorting him to cell two. At this time [Abrue] just turned around and started punching on him.

Q. Did he say at that point when the choking started in relation to the punching?

A. I don't recall.

*Id.* at 36–37.

At the conclusion of Officer Ellingsworth's rebuttal testimony, the trial court found Abrue guilty of simple assault and resisting arrest and sentenced him to one to two years of imprisonment for each conviction, with the sentences to run concurrently. *Id.* at 39, 41–42. In a timely appeal, Abrue raised three issues for this court's review: (1) whether the trial court erred in holding that Officer Ellingsworth's hearsay account of how the fight started was admissible under the excited utterance exception to the Pennsylvania Rules of Evidence, Pa.R.E. 803(2); (2) whether the trial court's decision to permit Officer Ellingsworth to describe Officer Maroney's version of events, in the absence of any testimony from Officer Maroney, violated Abrue's rights under the Confrontation Clause; and (3) whether the Commonwealth's evidence was sufficient to rebut his claim of self-defense. This Court found in favor of the Commonwealth on all three issues and affirmed the trial court's judgment of sentence. *Commonwealth v. Abrue*, 964 A.2d 427 (Pa.Super.2008) (unpublished memorandum decision).

Abrue filed a petition for allowance of appeal with our Supreme Court. By *per curiam* order dated April 7, 2010, the Supreme Court vacated our October 15, 2008 memorandum "insofar as it disposed of Petitioner's challenge to his judgment of sentence on Confrontation Clause grounds" and remanded Abrue's appeal to this Court "for reconsideration in light of *Commonwealth v. Allshouse,* [604 Pa. 61, 985 A.2d 847 (2009) ]." The Supreme

Court denied Abrue's petition for allowance of appeal in all other respects, and therefore our prior determinations with regard to the admission of hearsay testimony and the sufficiency of the evidence to support his convictions are not at issue here on remand. Our review of the Confrontation Clause issue presents us with a question of law, and thus our standard of review is plenary and our scope of review is *de novo. See, e.g., Commonwealth v. Liston,* 602 Pa. 10, 15, 977 A.2d 1089, 1092 (2009).

■ Application of our Supreme Court's decision in *Allshouse* cannot be accomplished without an analysis of the United States Supreme Court jurisprudence upon which it is based. The Confrontation Clause in the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . ." [2] U.S. Const. amend. VI. In *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the U.S. Supreme Court ruled that the Confrontation Clause did not bar admission of an unavailable witness's statement if the statement was surrounded by "adequate indicia of reliability." *Id.; Allshouse,* 985 A.2d at 852. According to the Court, adequate indicia of reliability exists if the statement fits within a "firmly rooted hearsay exception," or contains "particularized guarantees of trustworthiness." *Roberts,* 448 U.S. at 66, 100 S.Ct. 2531.

In *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court reversed its *Roberts* deci-

---

**2.** The Confrontation Clause applies to the states through application of the Fourteenth Amendment to the United States Constitution. *Pointer v. Texas,* 380 U.S. 400, 403–06, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). In Pennsylvania, "[i]n all criminal prosecutions the accused hath a right . . . to meet the witnesses face to face." Pa. Const. art. I, § 9. On remand, Abrue has presented no argument that he is entitled to any relief pursuant to the Pennsylvania Constitution, and therefore we do not address the issue.

sion, concluding that its "indicia of reliability" standard was too broad and left "too much discretion in judicial hands." *Id.* at 60, 67–68, 100 S.Ct. 2531. Noting that "judges, like other government officers, [can] not always be trusted to safeguard the rights of the people," *id.* at 67, 100 S.Ct. 2531, the Court concluded that the "unpardonable vice of the *Roberts* test ... [is] its demonstrated capacity to admit core testimonial statements that the Confrontation Clause plainly meant to exclude." *Id.* at 63, 100 S.Ct. 2531. The *Crawford* Court concluded that "[v]ague standards are manipulable, and while they might be a small concern in run-of-the-mill assault prosecutions like this one, the Framers had an eye toward politically charged cases ... where the impartiality of even those at the highest levels of the judiciary might not be so clear." *Id.* at 68, 124 S.Ct. 1354.

To establish a clear standard for the exclusion of evidence under the Confrontation Clause, the Supreme Court in *Crawford* reviewed the development of the right of confrontation through early English law and into colonial legal texts, including the Pennsylvania Declaration of Rights, § IX (1776). *Id.* at 48, 124 S.Ct. 1354. Focusing on the text of the Sixth Amendment, the Court noted that it refers to "witnesses" against the accused—"in other words, those who 'bear testimony.'" *Id.* at 51, 124 S.Ct. 1354 (citing 2 N. Webster, *An American Dictionary of the English Language* (1828)). "'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* The right of confrontation, in turn, provides the accused with an opportunity to respond to testimonial statements against him, and thus the "ultimate goal" of the Confrontation Clause is to permit the accused to test the reliability of a testimonial statement "in the crucible of cross-examination." *Id.* at 61, 124 S.Ct. 1354.

Accordingly, in reversing *Roberts,* the Supreme Court in *Crawford* established a new rule of admissibility for out-of-court testimonial statements, namely that they are inadmissible unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to cross-examine the witness. *Id.* at 68, 124 S.Ct. 1354 ("Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."). Out-of-court nontestimonial statements, on the other hand, are subject only to a state's hearsay rules and are "exempted ... from Confrontation Clause scrutiny." *Id.* The Court in *Crawford* did not attempt to distinguish comprehensively between testimonial versus nontestimonial statements for purposes of Confrontation Clause analysis. Instead it identified certain "core" testimonial statements that it described as the functional equivalent of "*ex parte* in-court testimony," including those "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial...." *Id.* at 52, 124 S.Ct. 1354; *see also Melendez–Diaz v. Massachusetts,* —— U.S. ——, 129 S.Ct. 2527, 2532, 174 L.Ed.2d 314 (2009). These include statements provided in affidavits, *id.* at 51, 124 S.Ct. 1354; depositions, *id.* at 52, 124 S.Ct. 1354; prior testimony at a preliminary hearing, before a grand jury, or at a former trial, *id.* at 68, 124 S.Ct. 1354; or given during police interrogations, *id.* at 68, 124 S.Ct. 1354.[3]

---

**3.** In *Crawford,* during a formal police interrogation, a wife stated that her husband's stab-

bing of the victim was not in self-defense. *Id.* at 36, 124 S.Ct. 1354. In reversing the state

Aside from these core testimonial statements, the Supreme Court in *Crawford* indicated that it would "leave for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Id.* That day came two years later in the subsequent case of *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). In *Davis*, the Supreme Court decided two companion cases, *Davis v. Washington* and *Hammon v. Indiana*. In *Davis*, Michelle McCottry ("McCottry") called 911, but the connection terminated before she spoke. *Id.* at 817, 126 S.Ct. 2266. The 911 operator reversed the call, and when McCottry answered she informed the operator that Adrian Davis ("Davis"), her former boyfriend, was beating her with his fists. *Id.* As the conversation continued, McCottry told the operator that Davis had just fled from the house. *Id.* at 817–18, 126 S.Ct. 2266. When the police arrived, they observed McCottry's "shaken state" and "fresh injuries on her forearm and her face." *Id.* at 818, 126 S.Ct. 2266. McCottry did not testify at trial, but over defense counsel's objections the trial court permitted the playing of a tape of her conversation with the 911 operator as the primary evidence against Davis. *Id.* at 818–19, 126 S.Ct. 2266. The jury convicted Davis, and the Washington state appellate courts affirmed the conviction. *Id.* at 819, 126 S.Ct. 2266.

In *Hammon*, police responded to the report of a domestic disturbance. When the police officers arrived at the home of Amy and Hershel Hammon, the domestic-violence incident between the two of them had ended. *Id.* at 819–20, 126 S.Ct. 2266. The officers separated the alleged victim (Amy) from her husband Hershel, after which one of the officers asked Amy to explain what had happened. *Id.* In response, Amy gave a statement to the officer describing Hershel's alleged domestic violence, which she then memorialized by signing a "battery affidavit." *Id.* at 820, 126 S.Ct. 2266. Amy did not appear at Hershel's subsequent bench trial, and so instead the prosecution, over repeated objections, was permitted to call the police officer who had questioned Amy. *Id.* The officer recounted Amy's statement to him and also authenticated her affidavit, after which the trial court found Hershel guilty. *Id.* The Indiana Supreme Court concluded that Amy's statement was non-testimonial because it had not been given for the purpose of preserving it for future use in legal proceedings. *Id.* at 821, 126 S.Ct. 2266. The state supreme court further concluded that her affidavit was testimonial and thus should not have been admitted, but that the trial court's error in this regard was harmless. *Id.*

The U.S. Supreme Court ruled that McCottry's statements to the 911 operator were non-testimonial, while Amy Hammon's statements to police were testimonial. In so doing, the Court relied upon two important distinctions between the two cases. First, "the circumstances of McCottry's interrogation objectively indicate its primary purpose was to enable police assistance *to meet an ongoing emergency*." *Id.* at 828, 126 S.Ct. 2266 (emphasis added). In addition, McCottry's statements were "necessary to be able to *resolve* the present emergency, rather than simply to learn ... what had happened in the past," as it was potentially important for responding officers to know whether they might be encountering a dangerous felon. *Id.* at 827, 126 S.Ct.

court's decision to allow the statement into evidence at the husband's trial, the U.S. Supreme Court noted that some statements "qualify under any definition" and that "statements taken by police officers in the course of interrogations are ... testimonial under even a narrow standard." *Id.* at 52, 124 S.Ct. 1354.

2266 (emphasis in original). In contrast, in Amy Hammon's case there was "no emergency in progress" and "no immediate threat to her person." *Id.* at 829–30, 126 S.Ct. 2266.

Second, the Supreme Court explained that an important temporal distinction exists between testimonial and non-testimonial statements. When the 911 operator interrogated McCottry, the purpose of the questioning was to determine "what is happening," whereas with Amy Hammon the purpose of the police questioning was to determine "what happened." *Id.* at 830, 126 S.Ct. 2266. This temporal difference between "what is happening" and "what happened" in turn reflects whether or not the statements constitute "a weaker substitute for live testimony" at trial. *Id.* at 828, 126 S.Ct. 2266 (quoting *United States v. Inadi,* 475 U.S. 387, 394, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986)). With respect to McCottry, she was "was speaking about events *as they were actually happening,* rather than 'describ[ing] past events.'" *Id.* at 827, 126 S.Ct. 2266 (emphasis in original) (quoting *Lilly v. Virginia,* 527 U.S. 116, 137, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality opinion)). As a result, her communication aligned with its courtroom analogue, since "[n]o 'witness' goes into court to proclaim an emergency and seek help."[4] *Id.*

For Amy Hammon, on the other hand, her statements, given after the events described had concluded, constituted an "explanation of how potentially criminal events began and progressed" and were intended to "nail down the truth about past criminal events." *Id.* at 830, 126 S.Ct. 2266. Objectively viewed, Amy Hammon's statements during the police interrogation were "an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination." *Id.* (emphasis in original).

Finally, in *Allshouse,* the Supreme Court of Pennsylvania addressed the testimonial/non-testimonial nature of statements made by a 4–year–old girl to a CYS caseworker and later to a psychologist. After the admission of a 7–month–old child (J.A.) to the hospital emergency room with a spiral fracture of his right arm, hospital workers (suspecting possible abuse) contacted CYS caseworker John Geist ("Geist"). *Allshouse,* 985 A.2d at 849. J.A., along with his twin brother M.A., his 4–year–old sister (A.A.), and his 8–year old brother (R.R.) were removed to the home of their paternal grandparents pending Geist's investigation. *Id.* During said investigation, the father, appellant Ricky Lee Allshouse ("Allshouse"), suggested that A.A. was the one who had caused the injury to J.A. *Id.* Accordingly, Geist went to the grandparent's home to interview A.A., who told Geist that it was Allshouse who had caused J.A.'s injury. *Id.* at 850. Geist then set up an evaluation for A.A. with a psychologist (Dr. Ryen), and during the interview A.A. again implicated Allshouse as the one who injured J.A. *Id.* At trial, A.A. did not testify, but both Geist and Dr. Ryen were permitted to recount

---

4. The Court in *Davis* recognized that the environment in which statements are given, including the attendant formalities or lack thereof, may be a factor in determining whether statements are testimonial or not. *Id.* at 827, 126 S.Ct. 2266 ("McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even ... safe."). Later, however, in connection with Amy Hammon's statements, the Court appeared to minimize the significance of the environment in which the statements are provided, noting that her statements were testimonial even though they were not provided at the police station, were not tape-recorded, and were not preceded by a *Miranda* warning. *Id.* at 830, 126 S.Ct. 2266. The Court stated that the environment was not "essential to the point" of trying to "nail down the truth about past criminal events." *Id.*

her statements to them regarding her father's actions. *Id.* at 851.

Our Supreme Court began its analysis by setting forth the *Davis* Court's general definition for distinguishing between testimonial and non-testimonial statements:

Statements are non-testimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 854 (quoting *Davis*, 547 U.S. at 822, 126 S.Ct. 2266).

■ Our ·Supreme Court interpreted this passage in *Davis* as establishing a "primary purpose" test. A statement is *non-testimonial* "if it is made with the purpose of enabling police to meet an ongoing emergency." *Id.* Conversely, a statement is *testimonial* if: "(1) it was made in absence of an ongoing emergency; and (2) the primary objective of the interrogation or questioning that resulted in the statement was to establish or prove past events." *Id.*

Applying the "primary purpose" test to the facts presented in *Allshouse,* the Supreme Court ruled that Geist's testimony was non-testimonial because it was given in an ongoing emergency:

Specifically, we note that, although [Allshouse] asserts that any ongoing emergency ended with J.A.'s removal from the family home on May 20, 2004, the validity of this assertion is premised on [Allshouse] having caused J.A.'s injury. On May 27, 2004, however, [Allshouse] told Geist that he believed A.A. had caused J.A.'s injury. N.T. Trial, 9/19/05, at 128. It was thus incumbent upon Geist to immediately investigate the matter further, because, at that time, A.A. and J.A. were together in their grandparents' home, where A.A. could do further harm to J.A. Indeed, Geist interviewed A.A. the same day that [Allshouse] told Geist he believed A.A. caused J.A.'s injury.

*Id.* at 858. With respect to Dr. Ryen's testimony, the Supreme Court concluded that A.A.'s statements to him were not provided during an ongoing emergency, as his evaluation with A.A. did not take place until two weeks after Geist's interview with her. *Id.* The Supreme Court declined to address the issue of the primary purpose of A.A.'s statements to Dr. Ryen, however, since "any possible error . . . was harmless because the statement was merely cumulative of A.A.'s statement to Geist, which we have concluded was properly admitted." *Id.* at 858–59.

■ Turning to the case *sub judice,* we must apply the *Crawford, Davis,* and *Allshouse* decisions to the facts presented here. This is no simple task, as there are few direct parallels between those cases and this one. Unlike in *Crawford,* Officer Maroney's statements here did not fall within the "core class of testimonial statements," including those made in those affidavits, depositions, prior testimony at a preliminary hearing, before a grand jury, or at a former trial, or given during police interrogations. *See Crawford,* 541 U.S. at 51–52, 124 S.Ct. 1354; *Melendez–Diaz,* 129 S.Ct. at 2531–32. While Officer Ellingsworth is a law enforcement officer, there is no evidence in the record that he was formally interrogating Officer Maroney at the time the statements were made. *Cf. Turner v. The State,* 281 Ga. 647, 651, 641 S.E.2d 527, 531 (2007) ("The fact that Glenn worked as a police officer does not

automatically convert any statement made to his colleagues into a testimonial statement ...."). The record also does not reflect that the statements were made with any degree of formality, *i.e.*, "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial...." *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354.

Likewise, the "primary purpose" test in *Davis* and *Allshouse* yields no clear result. Officer Maroney's statements clearly do *not* meet the definition of "non-testimonial" under this test, since neither party contends that they were made during an ongoing emergency or for the purpose of assisting police in responding to an ongoing emergency. The altercation between Officer Maroney and Abrue had ended at the time the statements in question were made, and Abrue had been returned to and locked in his cell. N.T., 9/4/07, at 12. On the other hand, there is no evidence in the record to demonstrate that the primary purpose of Officer Maroney's statements to Officer Ellingsworth was "to establish or prove past events potentially relevant to later criminal prosecutions." *Allshouse*, 985 A.2d at 854 (quoting *Davis*, 547 U.S. at 822, 126 S.Ct. 2266). Neither the *Davis* nor *Allshouse* decision provides any definitive guidance when the statements at issue were not made during an ongoing emergency, but also were not clearly made for the purpose of establishing past events. Under the *Davis/Allshouse* "primary purpose" test, Officer Maroney's statements do not readily qualify as either testimonial or non-testimonial. .

Under these circumstances, we conclude that Officer Maroney's statements were testimonial, for two reasons. First, the Supreme Court in *Davis* acknowledged that the "primary purpose" test was "not exhaustive and did not address all possible scenarios." *Davis*, 547 U.S. at 822 n. 1, 126 S.Ct. 2266; *see also Allshouse*, 985 A.2d at 854. As just explained, the case *sub judice* appears to present one such scenario. Accordingly, we must determine whether, in accordance with the basic principles espoused in *Davis*, including the temporal distinction between testimonial and non-testimonial statements, Officer Ellingsworth's testimony regarding what Officer Maroney told him was "a weaker substitute for live testimony," *Davis*, 547 U.S. at 828, 126 S.Ct. 2266.

In this regard, we note that the Supreme Court in *Davis* explained why McCottry's statements to the 9–11 operator were non-testimonial as follows:

> [McCottry] simply was not acting as a witness; she was not testifying. What she said was not "a weaker substitute for live testimony" at trial, *United States v. Inadi*, 475 U.S. 387, 394, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), like Lord Cobham's statements in *Raleigh's Case*, 2 How. St. Tr. 1 (1603), or Jane Dingler's *ex parte* statements against her husband in *King v. Dingler*, 2 Leach 561, 168 Eng. Rep. 383 (1791), or Sylvia Crawford's statement in *Crawford*. In each of those cases, the *ex parte* actors and the evidentiary products of the *ex parte* communication aligned perfectly with their courtroom analogues.

*Id.*

As this passage makes clear, McCottry's statements to the 9–11 operator were non-testimonial because no "witness" involved in an ongoing emergency (like McCottry) "goes into court to proclaim an emergency and seek help." *Id.* The replay at trial of the 9–11 tape containing McCottry's statements were not a "weaker substitute for live testimony," because McCottry would not have made the same statements during direct examination at trial. In significant contrast, the statements of someone who

describes to police how potentially criminal past events began and progressed are "aligned perfectly with their courtroom analogues" because "they do precisely *what a witness does* on direct examination." *Id.* at 830, 126 S.Ct. 2266 (emphasis in original).[5] Testimony at trial regarding someone else's description of past events is thus a "weaker substitute for live testimony," and may be used at trial against the accused only if the witness is both unavailable and the accused had a prior opportunity for cross-examination. *Crawford,* 541 U.S. at 68, 124 S.Ct. 1354.

Officer Maroney was clearly describing to Officer Ellingsworth his version of "what happened" during the altercation with Abrue, and in that regard he was doing "precisely what a witness does on direct examination." If Officer Maroney had been called to testify at Abrue's trial, he presumably would have testified consistently with his prior statements to Officer Ellingsworth describing his version of the commencement of his struggle with Abrue. Officer Ellingsworth's testimony regarding Officer Maroney's statements to him was a "weaker substitute for live testimony," namely that which could have been provided by Officer Maroney himself. Because the Commonwealth offered no evidence that Officer Maroney was unavailable to testify, and because he had not previously been subject to cross-examination by Abrue's counsel, the admission of Officer Ellingsworth's testimony violated Abrue's Sixth Amendment rights under the Confrontation Clause.

Second, the Commonwealth bears the burden of proving that the statements at issue are admissible under the Confrontation Clause. *See Idaho v. Wright,* 497 U.S. 805, 816, 110 S.Ct. 3139, 111 L.Ed.2d 638, (1990), *abrogated on other grounds by Crawford,* 541 U.S. at 67–68, 124 S.Ct. 1354; *Roberts,* 448 U.S. 56, 74–75, 100 S.Ct. 2531, 65 L.Ed.2d 597, *overruled on other grounds by Crawford,* 541 U.S. at 67–68, 124 S.Ct. 1354; *State v. Basil,* 202 N.J. 570, 596–97, 998 A.2d 472, 487 (2010) ("The government bears the burden of proving the constitutional admissibility of a statement in response to a Confrontation Clause challenge."); *State v. Bentley,* 739 N.W.2d 296, 298 (Iowa 2007) ("[W]e conclude the government bears the burden of proving by a preponderance of the evidence that [a witness's] statements are non-testimonial."), *cert. denied,* 552 U.S. 1275, 128 S.Ct. 1655, 170 L.Ed.2d 386 (2008).

As a result, the lack of evidence to demonstrate the primary purpose of Officer Maroney's statements inures to the detriment of the Commonwealth. In its appellate brief, the Commonwealth now contends that Officer Ellingsworth's questions and Officer Maroney's responses were non-testimonial because their primary purpose was not to disclose facts potentially relevant to future criminal prosecution. Instead, the Commonwealth argues that the discussion was "merely part of a natural exchange between co-workers about a stressful event that they had each partici-

---

**5.** In *In re S.R.,* 920 A.2d 1262 (Pa.Super.2007), *appeal granted,* 596 Pa. 146, 941 A.2d 671 (2007), this Court applied *Crawford* and *Davis* to statements made by a child alleging sexual abuse. This Court determined that statements made in response to questioning by the child's mother were non-testimonial, as they were "an attempt to address the immediate situation." *Id.* at 1268. We also determined that statements made by the child to a forensic interviewer at the direction of the police department, however, were testimonial because they were "the functional equivalent of a police interrogation; such statements are inherently testimonial because they 'are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination.'" *Id.* at 1264 (quoting *Davis,* 547 U.S. at 830, 126 S.Ct. 2266).

pated in and that had just taken place," with the apparent purpose of calming them down. Commonwealth's Brief at 6. The Commonwealth does not cite to any evidence of record in support of this contention, however, and our own independent review of the record on appeal has not disclosed any.

Despite numerous questions by counsel for both parties, Officer Ellingsworth could provide no context for the conversation, other than to say that it happened sometime shortly after the altercation with Abrue and that Officer Maroney was "upset" and "emotional." N.T., 9/4/07, at 32, 34. Officer Ellingsworth testified that other officers (including their sergeant) were also on the scene and talked with Officer Maroney, but he could not say why they were there, if he also talked to them, or if they were also present when the statements at issue here were made. *Id.* at 34–35.[6] As such, it is not possible to determine who was present when Officer Maroney made his statements; whether one or more persons at the scene (including, but not limited to, Officer Ellingsworth) were there for the purpose of investigating what happened for possible later criminal prosecution; or whether Officer Maroney was talking to Officer Ellingsworth (and/or other officers, including the sergeant) for the purpose of establishing what happened during the altercation with Abrue, or, con-

versely, as the Commonwealth contends, just to calm himself down after a traumatic experience. Neither counsel asked Officer Ellingsworth to clarify any of these issues, and neither Officer Maroney nor any other officers at the scene were called to testify. Accordingly, while *one* purpose of the exchange between the officers may have been to calm them down, the evidence of record does not establish that this was its sole, or *primary*, purpose. As a result, the Commonwealth did not satisfy its burden of proof for the admission of Officer Ellingsworth's testimony regarding Officer Maroney's statements.

For the foregoing reasons, we reverse the judgment of sentence and remand to the trial court for further proceedings consistent with this decision. Jurisdiction relinquished.

GANTMAN, J. concurs in the result.

6. Q. And you called the sergeant and the sergeant came?
A. A few people came in.
Q. And they talked to him before you talked to you, right?
A. But it's possible that Maroney had spoken to the sergeant who was on duty that night before he talked to you, right?
[Counsel for Commonwealth] Objection to speculation.
[Counsel for Abrue] Your Honor, it's possible—
[The Court] When you got to the cell, and at some point when he made a state-

ment to you, had any other officers arrived?]
[Officer Ellingsworth] There was officers that came in, yes.
[The Court] Before he said anything?
[Officer Ellingsworth] Yes, probably.
Q. And Maroney talked to these officers before he talked to you, right?
A. I don't recall that, no. I don't know who he talked to. I know he talked to me.
*Id.* at 34–35.