J-S08002-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARQUICE EVANS | : | |
| | : | |
| Appellant | : | No. 1925 WDA 2016 |

Appeal from the Judgment of Sentence November 18, 2016
In the Court of Common Pleas of Erie County Criminal Division at No(s):
CP-25-CR-0000818-2010,
CP-25-CR-0000819-2010, CP-25-CR-0002901-2015

BEFORE:   LAZARUS, J., KUNSELMAN, J., and STEVENS*, P.J.E.

MEMORANDUM BY LAZARUS, J.:                    FILED FEBRUARY 26, 2018

Marquice Evans appeals from the judgment of sentence, imposed in the Court of Common Pleas of Erie County, following his conviction, by a jury, for conspiracy to commit criminal homicide, criminal homicide, aggravated assault, burglary, recklessly endangering another person (REAP), access device issued to another who did not authorize use, unlawful restraint, and possession of an instrument of crime (PIC).  After careful review, we affirm.

The trial court cited the facts underlying this case as follows:

On the evening of June 22, 2015, K.J. and his cousin, J.D., spent the night with their [great-]grandmother, Sherry Lyons. The next afternoon, the granddaughter of one of Ms. Lyons' friends, Teonia Kimbro, visited Ms. Lyons' home. Ms. Kimbro arrived on a bicycle.

Kimbro left Ms. Lyons' home shortly after arriving, but returned about ten minutes later asking for a cup of water.  Kimbro left her bicycle in Ms. Lyons' backyard. At some point, J.D. asked his [great-]grandmother if he and K.J. could go to Mighty Fine

---

*   Former Justice specially assigned to the Superior Court.

Doughnuts. Ms. Lyons consented, gave Kimbro her bank card, and asked Kimbro to accompany the boys.

The three left Ms. Lyons' residence on foot and arrived at Mighty Fine Doughnuts where Kimbro purchased half a dozen doughnuts with Ms. Lyons' bank card. After they finished eating, they packaged the extra doughnuts to-go and walked to the Country Fair on the corner of 26th and State Street, across from Veteran's Stadium. J.D. and K.J. saw Kimbro attempt to use Ms. Lyons' bank card at the ATM machine inside the store.

After leaving the Country Fair on the corner of 26th and State Street, the three walked to a car lot on 26th Street. While there, K.J. recalled a short, dark-skinned male with dread[]locks approached Kimbro. The man was wearing a black t-shirt and black shorts, and arrived on the same bike Kimbro left at Ms. Lyons' home. K.J. believed the male was Kimbro's friend, but stated the two argued, and the man left the car lot quickly.

Instead of taking K.J. and J.D. back to their [great-]grandmother's house, Kimbro took K.J. and J.D. to a park on 23111 Street, and then to the Dollar General across the street from Mighty Fine Doughnuts, despite their requests to return to Ms. Lyons' home. While at Dollar General, the children asked Kimbro to buy them candy. Kimbro told the children she couldn't because she "lost" Ms. Lyons' bank card. After leaving the Dollar General, Kimbro took K.J. and J.D. to a McDonalds on 26th Street, stating her phone was dying and she needed to call someone. While at the McDonalds, Kimbro used a landline phone and K.J.'s cell phone to place a call.

Subsequently, Kimbro took the children to a friend's home at the intersection of East 6th and State Streets. While there, K.J. noticed the same man who met Kimbro at the car lot arrive on the same bike, but noticed he was wearing different clothing.

Shortly after 8:00 p.m., K.J.'s mother, Talaysha Stanton, saw the children outside a corner store near East 6th and State Streets when she was on her way to pick up some items at a nearby shop. She also saw [Evans] outside the store. Instead of taking the children back to Ms. Lyons' home, Talaysha took the children to her home. Once K.J. and J.D. reached Talaysha's home, K.J. told his mother Kimbro lost his grandmother's bank card. After learning K.J. knew where to find Kimbro, Talaysha sent him to retrieve the card. However, K.J. was unable to recover it.

Talaysha testified that before she found the children she attempted to reach Ms. Lyons just before 8:00 p.m. However, Ms. Lyons did not answer the phone. Once Talaysha and the children arrived home, Talaysha called Ms. Lyons again. No one answered. Talaysha became worried and called her aunt, Darlene Stanton, who had a key to Ms. Lyons' home.

Talaysha, Darlene, and several of Ms. Lyons' nieces arrived at Ms. Lyons' home around 11:00 p.m. Talaysha testified the family saw blood around the entryway of the home and on the floor as soon as they entered the residence. When the family entered the living room, they saw more blood on the carpet near the couch and on the wall, but no sign of Ms. Lyons. The family searched the upper floors of the home for Ms. Lyons with no success. The family then directed their search to the basement.

Talaysha testified she saw more blood at the top of the basement stairs and a large hole in the wall at the foot of the stairs. A pool of blood was beneath the hole.

The family found Ms. Lyons in one of the back basement rooms. Ms. Lyons was lying on her back with her shirt pulled up around her middle, a television on her chest, and one leg in the air. Duct tape was wrapped around Ms. Lyons covering her eyes, nose, and mouth. The family found Ms. Lyons' cordless phone had been running for six and a half hours, close to the last time a neighbor saw her sitting on her front porch.

Various members of the Erie Police Department were dispatched to the Lyons residence around 11:50 p.m. for a possible homicide. Detectives arrived on the scene at approximately 1:30 a.m. on June 24, 2015. Detective Kensil, one of the detectives on duty, took photographs of the Lyons residence capturing the blood pooling and blood splatter found throughout. Included in these photographs were pictures of a roll of duct tape found on the couch where blood was also present, and pieces of a broken, decorative wooden spoon. The detective also took a picture of the hole found at the bottom of the basement steps. He described the hole as being "about the size of a human head," and stated he saw drag marks left in blood on the basement carpet leading to the room where Ms. Lyons was found.

The detective also observed Ms. Lyons before she was taken for autopsy. He corroborated the family's testimony her head was wrapped in duct tape. In fact, the detective stated the tape covered Ms. Lyons' head so completely it was impossible to

identify her. He also testified she appeared to have been beaten, and dragged by her legs, which explained the manner in which her shirt was rolled up from her waist. The detective observed a large TV on the ground next to Ms. Lyons' body.

Other evidence found at the home included a sweatshirt matching Ms. Lyons' clothing, two broken pieces of a wooden spoon, a Fago soda pop bottle, and a pizza crust. Several surfaces were processed for fingerprinting and DNA evidence including the front door and threshold, pill bottles, blood on various floor surfaces, walls, pieces of the wooden spoon, and duct tape. The detective also acquired a pair of white Nike shoes from [Evans] when he was arrested. No forensic evidence was retrieved from the duct tape. Any other item recovered with potential evidence was sent to the PSP crime lab for analysis and verification.

After autopsy, the forensic pathologist concluded Ms. Lyons died from suffocating asphyxiation secondary to the application of multiple loops of duct tape around her face with a concurrent component of incapacitating blunt force trauma to the head. The doctor testified the blunt force trauma Ms. Lyons sustained could have been caused by the wooden spoon handle recovered from the crime scene. The fracture to her skull could have been consistent with an injury sustained after being thrown down a flight of stairs.

In addition to the injuries to Ms. Lyons' brain and skull area, the doctor found several contusions on the inside of her calves and on her right upper arm he described as "fingertip contusions." The doctor also found brush burn abrasions in the middle of Ms. Lyons' lower back he described as "rug burn," rib fractures, and a disruption of the bone between her right collar bone and the sternum of her breast bone. The doctor explained these fractures would be consistent with a large, heavy object, such as a TV, being placed on Ms. Lyons' chest. It was also the doctor's opinion that at the time the TV was placed on Ms. Lyons' chest she was alive.

Of the pieces of evidence submitted to the forensic lab, Tim Gavell, a forensic scientist with the Pennsylvania State Police DNA Lab, matched DNA lifted from the spoon handle to Sherry Lyons and the Defendant, Marquice Evans. No other DNA was present on the spoon handle. Gavell also confirmed the blood splatter found on the living room wall matched Sherry Lyons' DNA. The DNA found on the Fago pop bottle submitted to the lab provided only a partial profile, and matched someone in [Evans'] paternal lineage.

Detective Lorah testified K.J. identified [Evans] as the man he saw with Kimbro from a picture line up shortly after the police investigation began. Juan Garcia, [Evans'] cousin, identified Teonia Kimbro as [Evans'] "baby mom."

Video footage and bank records were recovered from various places of business and a Northwest Savings bank that placed Ms. Lyons' bank card in [Evans'] hands after he was seen with Ms. Kimbro in the car parking lot, and after Ms. Lyons' death. Bank statements confirmed a transaction at Mighty Fine Doughnuts, and also showed a denied attempt to withdraw $500.00 from an ATM at the Country Fair located at 26th and State Streets at 5:12 p.m. After this attempt, another was made in the amount of $200.00 at the same Country Fair at 5:32 p.m. Another withdrawal attempt was made at the Country Fair located at 802 East Avenue for $150.00 around 7:52 p.m., with another denied at that same location a half hour later. [Evans] was also seen making a purchase around 10:30 p.m. at the Shell gas station on 6th and Parade. The video footage recovered from these locations showed Kimbro using the bank card at the 26th and State Street Country Fair, and [Evans] attempting to withdraw funds with that card at the other locations.

Text messages were also recovered from Kimbro's cell phone after she was taken into custody linking the Defendant to Ms. Lyons' death and the use of her bank card. In Kimbro's phone, police found a conversation she had with a contact named "Quice" that named him as the father of her child, a picture of a positive pregnancy test, and "selfies" of one person being sent to the other. Many of the messages referenced bank transactions associated with Ms. Lyons' card that occurred on June 19th.

Other messages directly referenced Sherry Lyons' murder including those which read: "Either you going to kill this bitch before the 1st or you going to give it back," "Okay. You got my word. She a goner," and "go over there and handle that quietly." Others asked one if the other knew whether Ms. Lyons' door was unlocked. One message stated they had to kill Sherry before she went to the police about getting her money back. Call records also showed the number associated with "Quice" called Kimbro's phone at the time [Evans] used the victim's ATM card at a Northwest Savings Bank, and 22 other times on June 23, 2015. Coincidentally, the phone number associated with

the "Quice" contact disappeared once Kimbro was taken into custody.

Finally, Christopher Hazel, an inmate at SCI Westmoreland, testified about the last contact he had with [Evans]. Hazel testified [Evans], whom he casually knew as "Quice," contacted him in the middle of June, 2015, telling him he was going to visit him in Pittsburgh soon. Eventually, the two met at a Greyhound bus station in Pittsburgh. Hazel testified [Evans] told him he was in trouble up in Erie County, that he ["]caught["] a homicide, and the police found the body within five hours of when he did it. [Evans] also told Hazel he bashed the victim's face in and only got $400.00 off the victim's debit card before the police froze the account.

According to Hazel, [Evans'] "baby mom" was in jail for the offense and agreed to "take the case" for him. Originally, [Evans] told Hazel his girlfriend was going to try to distract the victim, and he was going to sneak up on her and choke her so they could steal her credit card, but the plan didn't work because the victim saw [Evans'] face. [Evans] described the injuries he caused to the victim as being "horrendous and the gruesomest [sic] murder ever seen in Erie, Pennsylvania." [Evans] also told Hazel it was his girlfriend's plan to steal the money, and, if necessary, kill the victim.

Trial Court Opinion, 3/10/17, at 3-10 (emphasis added) (citations to notes of testimony omitted).

After a two-day trial, the jury convicted Evans on all charges. Evans was sentenced to life imprisonment, plus 38 years and five months to 77 years of imprisonment. Evans filed a post-sentence motion that was granted in part and denied in part; the court modified Evans' sentence to life imprisonment, plus 25 years and six months to 51 years and one month of imprisonment. This timely appeal follows.

On appeal, Evans presents the following issue for our consideration: Whether the trial court erred and/or abused its discretion in denying [Evans']

[m]otion in [l]imine seeking to limit[1] and/or suppress the statements of the co-defendant and the text messages.[2]

Bruton Claim

Evans first claims that by admitting the text messages at his trial, his constitutional rights under the Confrontation Clause were violated under the Supreme Court's decision, Bruton v. United States, 391 U.S. 123 (1968).

In Bruton, at the defendant and co-defendant's joint trial, the trial court admitted the co-defendant's confession to a postal inspector as substantive evidence of guilt. Id. at 124. The trial court instructed the jury that the confession could only be used against the co-defendant, as the declarant, and could not be considered against the defendant, since the statement was inadmissible hearsay. Id. at 125. Following a conviction, the defendant appealed on the basis that the admission of the statement at trial violated his right of confrontation and that the instruction was insufficient to protect his confrontation rights. On appeal, the Supreme Court held that "in the context

---

[1] We may reverse rulings on the admissibility of evidence only if we find that the trial court abused its discretion. Commonwealth v. Lockcuff, 813 A.2d 857, 860 (Pa. Super. 2002). Moreover, admissibility depends on relevant and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact. Commonwealth v. Levanduski, 907 A.2d 3, 13-14 (Pa. Super. 2006).

[2] On July 11, 2017, in response to Evans' application seeking remand, our Court remanded the instant case to permit defense counsel to file a supplemental Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

of a joint trial, we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination." Id. at 136.

First, we note that Evans' co-defendant, Kimbro, was tried separately, not jointly with him. Moreover, as the trial court acknowledges, the text messages were non-testimonial in nature; they were not made under circumstances which would lead an objective witness reasonably to believe that the statements would be available for use at a later trial. Melandez-Diaz v. Massachusetts, 129 S. Ct. 2527 (2009). Out-of-court non-testimonial statements are subject only to a state's hearsay rules and are exempted from Confrontation Clause scrutiny. Commonwealth v. Abrue, 11 A.3d 484 (Pa. Super. 2010), citing Crawford v. Washington, 541 U.S. 36, 68 (2004).

Accordingly, we conclude that Bruton, and its attendant Confrontation Clause violation concerns, are not implicated. Thus, we find the claim meritless.

Koch/Authentication Claim

Evans next claims that the Commonwealth did not properly authenticate the text messages where they came from a burner phone or a phone brought from a store with no registration details, the actual phone was never recovered, and no identifying information regarding the owner of the phone or the author of the texts was ever identified.

In Commonwealth v. Koch, 39 A.3d 996 (Pa. Super. 2011), affirmed by equally divided court, 106 A.3d 705 (Pa. 2014), our Court recognized that:

> Text messages are somewhat different in that they are intrinsic to the cell phones in which they are stored. While e-mails and instant messages can be sent and received from any computer or smart phone, text messages are sent from the cellular phone bearing the telephone number identified in the text message and received on a phone associated with the number to which they are transmitted. The identifying information is contained in the text message on the cellular telephone. However, as with e-mail accounts, cellular telephones are not always exclusively used by the person to whom the phone number is assigned.
>
> Authentication is a prerequisite to admissibility. . . . [A]uthentication of electronic communications, like documents, requires more than mere confirmation that the number or address belonged to a particular person. Circumstantial evidence, which tends to corroborate the identity of the sender, is required.

Id. at 1004-1005.

Here, the Commonwealth points out that there was ample corroborating evidence supporting the conclusion that Evans and his co-conspirator, Kimbro, authored the text messages. That evidence included: the phone receiving and sending the text messages was recovered from Kimbro; the phone number texting Kimbro's phone was saved within her phone under the name, "Quice"; the contact known as "Quice" responded to the sender calling him "Marquise" [sic]; texts identified "Quice" as the father of Kimbro's baby; Evans told police that Kimbro was carrying his child; text messages between "Quice" and Kimbro discussed the amount of currency "Quice" was seen withdrawing on video surveillance at ATM's; phone records showed that "Quice's" phone

number made calls during the time Evans is seen on video talking on a cell phone; pictures of Evans recovered from Kimbro's phone and sent between that phone and "Quice" show him wearing a Chicago bulls hat which was the same hat he wore on surveillance videos using the victim's debit card; and texts discussed the actual killing of the victim.

Based on the record, we conclude that there was sufficient circumstantial evidence to corroborate the identity of the text message authors, Kimbro and Evans, for authentication purposes. Koch, supra; Commonwealth v Mosley, 114 A.3d 1072 (Pa. Super. 2015).

Pennsylvania Rule of Evidence 803 Claim

Evans contends that the trial court improperly admitted hearsay evidence, under Pennsylvania Rule of Evidence 803(25)(E), where no proper foundation was made to show that "a conspiracy existed between the declarant and the person against whom the evidence [wa]s offered."

Rule 803(25)(E), an exception to the rule against hearsay, provides that an opposing party's statement is admissible where "[t]he statement is offered against an opposing party and . . . was made by the party's co[-]conspirator during and in furtherance of the conspiracy." In order to establish the admissibility of a co-conspirator's statement under Rule 803(25)(E), the Commonwealth must only show that a conspiracy existed by a preponderance of the evidence. Commonwealth v. Greene, 702 A.2d 547 (Pa. Super. 1997).

Here, both K.J. and Talayshia Stanton, the victim's granddaughter, offered circumstantial evidence that a conspiracy existed between Evans and Kimbro. Moreover, the video testimony as well as testimony from fellow inmate, Christopher Hazel, support the conclusion that Evans and Kimbro were co-conspirators. Accordingly, we conclude that the Commonwealth proved a conspiracy by a preponderance of the evidence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/26/2018