**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTHONY J. DIVALENTINO | : | |
| | : | No. 787 EDA 2017 |
| Appellant | : | |

Appeal from the Judgment of Sentence August 30, 2016
In the Court of Common Pleas of Monroe County Criminal Division at
No(s): CP-45-CR-0000840-2010

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTHONY J. DIVALENTINO | : | |
| | : | No. 788 EDA 2017 |
| Appellant | : | |

Appeal from the Judgment of Sentence August 30, 2016
In the Court of Common Pleas of Monroe County Criminal Division at
No(s): CP-45-CR-0000792-2010

BEFORE:   PANELLA, J., LAZARUS, J., and STRASSBURGER*, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED AUGUST 13, 2018**

Anthony J. DiValentino appeals from the judgments of sentence, entered

in the Court of Common Pleas of Monroe County, after his conviction of two

_____
*   Retired Senior Judge assigned to the Superior Court.

counts of harassment,[1] two counts of kidnapping,[2] two counts of retaliation against a witness,[3] two counts of simple assault,[4] coercion/threat to commit a crime,[5] false imprisonment,[6] intimidation of a witness,[7] stalking,[8] terroristic threats,[9] and unlawful restraint.[10] After careful review, we affirm based, in part, on the Honorable Jonathan Mark's opinion.

On March 21, 2010, police responded to a domestic incident involving DiValentino and his paramour, Ann Marie Andrews. Police subsequently arrested DiValentino and charged him with simple assault; he spent a short time in jail before posting bail. From the day of the assault until April 21, 2010, DiValentino continuously made threatening phone calls to Andrews in an attempt to intimidate and prevent her from testifying at his preliminary hearing for simple assault. On April 22, 2010, the morning of DiValentino's

---

[1] 18 Pa.C.S.A. § 2709.

[2] 18 Pa.C.S.A. § 2901.

[3] 18 Pa.C.S.A. § 4953.

[4] 18 Pa.C.S.A. § 2701.

[5] 18 Pa.C.S.A. § 2906.

[6] 18 Pa.C.S.A. § 2903.

[7] 18 Pa.C.S.A. § 4953.

[8] 18 Pa.C.S.A. § 2709.1.

[9] 18 Pa.C.S.A. § 2706.

[10] 18 Pa.C.S.A. § 2902.

preliminary hearing, Andrews awoke to DiValentino pressing the barrel of a gun to her back. DiValentino held Andrews hostage, threatened her so she would not testify at his preliminary hearing, and stated he test-fired the gun into a pillow to ensure no one would hear his firearm discharge if he shot her. After approximately an hour, at Andrews' request, DiValentino released her so that she could take her daughter to the school bus stop. Andrews dropped her daughter off at the bus stop and proceeded directly to the police. Later that day, police arrested DiValentino and charged him with kidnapping, intimidation of a witness and related offenses. On April 26, 2010, Andrews was granted a three-year protection from abuse ("PFA") order against DiValentino. On June 10, 2010, DiValentino waived his right to a preliminary hearing in exchange for reduced bail, and he was released on bail on the condition he not contact Andrews.

On June 14, 2010, while Andrews was driving to work on Interstate 84 ("I-84") in New York State, DiValentino used his vehicle to run Andrews off the road. DiValentino caused a serious crash that injured Andrews and required emergency response personnel to extricate her from her vehicle with the Jaws of Life. DiValentino fled the scene and attempted to commit suicide, but New York State police apprehended him before his self-inflicted wounds proved fatal. New York State police later charged DiValentino with attempted murder and related offenses stemming from the I-84 incident. DiValentino remained incarcerated in New York State while awaiting trial both there and in Pennsylvania.

Sometime between December 2010 and January 2011, DiValentino conspired with a fellow inmate to murder or hire someone to murder Andrews. He provided the inmate with maps to Andrews' home, diagrams of the home, personal information about Andrews and her daughter, the home's garage code, details about the home's alarm system, and Andrews' daughter's school schedule. Unbeknownst to DiValentino, the inmate was a police informant who agreed to wear a wire during their conversations. On February 10, 2011, a grand jury indicted DiValentino for conspiracy and solicitation to commit murder.

DiValentino's New York State proceedings took over five years to complete, during which time he continued to litigate his Pennsylvania cases. During this time, the Commonwealth repeatedly attempted to get DiValentino extradited to Pennsylvania, and on September 11, 2015, DiValentino waived extradition. By then, the New York Supreme Court had convicted DiValentino of attempted murder and related charges.

DiValentino's Pennsylvania trial commenced on June 21, 2016, and concluded on June 23, 2016. A jury convicted DiValentino of all the foregoing charges. On August 30, 2016, the trial court sentenced DiValentino to an aggregate term of 150 to 300 months' incarceration to be served consecutive to his New York State sentence. The trial court applied the deadly weapon enhancement to DiValentino's sentence, pursuant to 42 Pa.C.S.A. § 9712, but,

notably, the jury did not find DiValentino guilty of possession of an instrument of crime ("PIC").[11]

On February 1, 2017, the trial court denied DiValentino's various post-sentence motions. DiValentino timely appealed, and both the trial court and DiValentino complied with Pa.R.A.P. 1925. On appeal, DiValentino raises the following issues for our review:

1. Did the trial court err in denying [DiValentino's] motion to dismiss where the Commonwealth denied him his constitutional right to a speedy trial by greatly exceeding the time frames established by [] Rule 600 as well as the [Interstate Agreement on Detainers ("IAD")[12]] for bringing the matter to trial?

2. Did the trial court commit reversible error by permitting irrelevant and highly prejudicial evidence of other bad acts?

3. Did the trial court commit reversible error by permitting testimonial hearsay to be admitted against [DiValentino], in violation of the Confrontation Clause of the Sixth Amendment of the United States Constitution and Article I, Section 9 of the Pennsylvania Constitution.

4. Was the evidence presented at trial insufficient to prove beyond a reasonable doubt that [DiValentino] held an individual in a place of confinement, a necessary element of a kidnapping charge?

---

[11] 18 Pa.C.S.A. § 907.

[12] The IAD is an agreement that established procedures for the transfer of prisoners incarcerated in one jurisdiction to the temporary custody of another jurisdiction, which has lodged a detainer against them. *Commonwealth v. Williams*, 896 A.2d 523, 536 (Pa. 2006).

J-A08024-18

Brief of Appellant, at 10-11.[13]

DiValentino first argues the trial court erred in denying his pretrial motion to dismiss charges pursuant to Pa.R.Crim.P. 600. Our standard and scope of review of a trial court's denial of a motion to dismiss pursuant to Rule 600 is as follows:

> In evaluating Rule 600 issues, our standard of review of a trial court's decision is whether the trial court abused its discretion. The proper scope of review in determining the propriety of the trial court[']s ruling is limited to the evidence on the record of the Rule 600 evidentiary hearing and the findings of the lower court. In reviewing the determination of the hearing court, an appellate court must view the facts in the light most favorable to the prevailing party.

*Commonwealth v. Cook*, 865 A.2d 869, 875 (Pa. Super. 2004) (citation and internal formatting omitted).

The version of Rule 600 that the trial court applied to DiValentino's Rule 600 motion stated, in relevant part, as follows:[14]

> [(A)](3) Trial in court case in which a written complaint is filed against the defendant, when the defendant is at liberty on bail,

_____

[13] DiValentino raised an additional issue in his Rule 1925(b) statement, which the trial court addressed in its Rule 1925(a) opinion: "The trial court erred in applying the [d]eadly [w]eapon [u]sed [e]nhancement . . . [where] there was insufficient evidence to establish by a preponderance of the evidence that [he] visibly possessed a firearm in the commission of a crime." DiValentino Rule 1925(b) statement, 4/3/2017. However, DiValentino has abandoned this issue on appeal by failing to argue it in his brief. *Commonwealth v. Miller*, 721 A.2d 1121, 1124 (Pa. Super. 1998) ("Failure to brief an issue is to waive it, as such omission impedes our ability to address the issue on appeal.").

[14] A new version of Rule 600 was adopted in October 2012, and became effective on July 1, 2013.

- 6 -

shall commence no later than 365 days from the date on which the complaint is filed.

* * *

(C) In determining the period for the commencement of trial, there shall be excluded therefrom:

> (1) the period of time between the filing of the written complaint and the defendant's arrest, provided that the defendant could not be apprehended because his or her whereabouts were unknown and could not be determined by due diligence;
>
> (2) any period of time for which the defendant expressly waives Rule 600;
>
> **(3) such a period of delay at any stage of the proceedings as results from:**
>
> > **(a) the unavailability of the defendant** or the defendant's attorney;
> >
> > (b) any continuance granted at the request of the defendant or the defendant's attorney.

Pa.R.Crim.P. 600(A)(3), (C) (rescinded October 1, 2012, effective July 1, 2013) (emphasis added).

> [T]he courts of this Commonwealth employ three steps – corresponding to Rules 600(A), (C), and (G) – in determining whether Rule 600 requires dismissal of charges against a defendant. First, Rule 600(A) provides the mechanical run date. Second, we determine whether any excludable time exists pursuant to Rule 600(C). We add the amount of excludable time, if any, to the mechanical run date to arrive at an adjusted run date.
>
> If the trial takes place after the adjusted run date, we apply the due diligence analysis set forth in Rule 600(G). As we have explained, Rule 600(G) encompasses a wide variety of circumstances under which a period of delay was outside the control of the Commonwealth and not the result of the

Commonwealth's lack of diligence. Any such period of delay results in an extension of the run date. Addition of any Rule 600(G) extensions to the adjusted run date produces the final Rule 600 run date. If the Commonwealth does not bring the defendant to trial on or before the final run date, the trial court must dismiss the charges.

***Commonwealth v. Ramos***, 936 A.2d 1097, 1103 (Pa. Super. 2007) (internal citations and footnote omitted). The Commonwealth has the burden of proving by a preponderance of the evidence that it exercised due diligence in accordance with Rule 600. ***Commonwealth v. Bradford***, 46 A.3d 693, 701 (Pa. 2012). When a foreign jurisdiction detains a defendant, Rule 600 works in conjunction with the IAD to ensure that the defendant gets a speedy trial. 42 Pa.C.S.A. § 9101.

Instantly, the trial court determined that DiValentino was unavailable for trial primarily due to New York State's refusal to grant extradition. The trial court established on the record its reasons for denying DiValentino's Rule 600 motion at trial, N.T. Trial, 6/21/16, at 9-19, and at a hearing on his post-sentence motions. N.T. Post-Sentence Motions Hearing, 2/1/17, at 21. Moreover, the trial court attached to its Rule 1925(a) opinion an addendum reiterating its reasons for denying DiValentino's Rule 600 motion. Hearing Addenda 1, 2/1/17, at 13-19. ***See*** N.T. Post-Sentence Motions Hearing, 2/1/17, at 9 (Judge Mark directed the court reporter to attach the addendum "to any transcript that is made of [the February 1, 2017] proceeding so that the law [he] used is clear and a matter of record."). After review of the relevant notes of testimony, the trial court's hearing addenda, the certified

record, the parties' briefs, and Judge Mark's opinion, we find the trial court did not abuse its discretion by denying DiValentino's Rule 600 motion.

DiValentino next argues that the trial court erred in allowing the jury to hear "extensive evidence about events that occurred well after the events at issue in this case," namely, "the New York events." Brief of Appellant, at 39-40. Specifically, DiValentino argues the "New York events bore no relevance to the crimes at issue." *Id.* at 40.

"Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." *Commonwealth v. Tyson*, 119 A.3d 353, 357 (Pa. Super. 2015) (citation omitted). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Id.* at 357-58 (citation omitted).

Pennsylvania Rule of Evidence 404(b) states as follows:

(1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.

(2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

(3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case

only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

(4) In criminal cases, the prosecution shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Pa.R.E. 404(b).

DiValentino's Rule 404(b) claim generally centers on the relevance and prejudicial value of *all* evidence the Commonwealth proffered regarding the circumstances relevant to his convictions for attempted murder, conspiracy, solicitation to commit murder and related charges. Instantly, the trial court determined that DiValentino's failure to specifically identify or cite to particular evidence of record what evidence he challenges waives this claim. Even so, the trial court aptly explained why DiValentino's Rule 404(b) claim is meritless, primarily relying on the *res gestae* exception.

*Res gestae* evidence describing other crimes or bad acts is admissible to tell the complete story; such evidence may be admitted, however, only if the probative value of the evidence outweighs its potential for unfair prejudice. ***Commonwealth v. Hairston***, 84 A.3d 657, 665 (Pa. Super. 2014). Here, 85 days elapsed between DiValentino's March 21, 2010 assault of Andrews in Pennsylvania, and the June 14, 2010 I-84 incident; however, he spent 50 of those days in jail. The I-84 incident occurred a mere four days after DiValentino posted bail for kidnapping and related charges. The New York events are probative and relate arguably to the Pennsylvania events.

- 10 -

Therefore, we agree that the trial court did not abuse its discretion in allowing the Commonwealth to proffer evidence of the subsequent New York events.

DiValentino next avers the trial court erred by permitting testimonial hearsay implicating him in various crimes in violation of the Confrontation Clause. Specifically, DiValentino claims the trial court erred in allowing the Commonwealth to play consensual wire intercept recordings of his conversations with a jailhouse informant. DiValentino did not specify whether he is challenging the entirety of the recordings, his statements alone, or just the statements of the jailhouse informant.

The Confrontation Clause of the Sixth Amendment, made applicable to the states via the Fourteenth Amendment, provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. *Commonwealth v. Yohe*, 79 A.3d 520, 544 (Pa. Super. 2013). The Confrontation Clause applies not only to in-court testimony, but also to out-of-court statements introduced at trial. *Crawford v. Washington*, 541 U.S. 36, 50-51 (2004). However, the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 47. A statement is testimonial if the primary purpose of the statement was to establish or prove past events. *Commonwealth v. Abrue*, 11 A.3d 484, 491 (Pa. Super. 2010). On the other hand, where non-testimonial hearsay is concerned, such statements are subject only to a state's hearsay rules and are exempted from Confrontation Clause scrutiny. *Id.* at 488. A statement is non-testimonial if

it was made with the purpose of enabling police to meet ongoing emergency. *Id.* at 491.

Additionally, hearsay statements are admissible where: (1) a defendant's co-conspirator made them during and in furtherance of the conspiracy, Pa.R.E. 803(25)(E); and (2) a reasonable person in the declarant's position would have made the statement only if the person believed it to be true because, when made, it was so contrary to the declarant's interest. Pa.R.E. 804(b)(3)(A).

The trial court determined that statements made by DiValentino proffered by the Commonwealth were: (1) offered for context, rather than truth; (2) non-testimonial; (3) made in furtherance of a criminal conspiracy; and (4) comprised of party admission statements and statements against one's interests. We agree. DiValentino's statements were constitutionally admissible, and, thus, his Confrontation Clause claim must fail.

Lastly, DiValentino claims the evidence was insufficient to prove he held Andrews in a place of confinement, a necessary element of kidnapping.

Our standard and scope of review of sufficiency claims is well settled:

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention to human experience and the law of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the

verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

[A] person is guilty of kidnapping if he unlawfully removes another a substantial distance under the circumstances from the place where he is found, or if he unlawfully confines another for a substantial period in a place of isolation, with any of the following intentions:

> (1) To hold for ransom or reward, or as a shield or hostage.
>
> (2) To facilitate commission of any felony or flight thereafter.
>
> (3) To inflict bodily injury on or to terrorize the victim or another.
>
> (4) To interfere with the performance by public officials of any governmental or political function.

18 Pa.C.S. § 2901(a). For purposes of the kidnapping statute, a "place of isolation" is not a geographic isolation, but rather effective isolation from the protections of society. ***Commonwealth v. Jenkins***, 687 A.2d 836 (Pa. Super. 1996). The requirement that the victim be confined in a place of isolation for purposes of establishing the crime of kidnapping does not require that the victim be left alone. ***In the Interest of T.G.***, 836 A.2d 1003, 1008 (Pa. Super. 2003). The fact that other people are present does not necessarily negate the victim's isolation from the usual protections of society. ***Id.***

The trial court determined the evidence of record is sufficient to sustain DiValentino's kidnapping conviction where he held Andrews at gunpoint for over an hour in her bedroom and threatened to shoot her if she reached for

the phone. Hearing Addenda 1, 2/1/17, at 19-21; *see* N.T. Post-Sentence Motion Hearing, 2/1/17, at 37-19. Moreover, contrary to DiValentino's assertion, it is of no consequence that Andrews' daughter was present in the home when he kidnapped her. *T.G.*, *supra*. Viewed in a light most favorable to the Commonwealth, there was ample evidence demonstrating that DiValentino held Andrews against her will for a substantial period. Thus, DiValentino's sufficiency claim is meritless.

Based on our review of the parties' briefs, the relevant case law and the certified record on appeal, we dispose of DiValentino's first four claims based on Judge Mark's opinion. We direct the parties to attach a copy of that decision in the event of further proceedings in the matter.

Last, DiValentino purports to challenge the legality of his sentence under *Alleyne v. United States*, 570 U.S. 99 (2013). At trial, a jury acquitted DiValentino of PIC. However, at sentencing, the trial court imposed the deadly weapon enhancement by way of judicial fact-finding under the preponderance of the evidence standard. The Commonwealth concedes that the trial court applied the preponderance of the evidence standard in applying the deadly weapon enhancement. Brief of Appellee, at 49. In *Alleyne*, the court held certain sentencing factors are elements of the underlying crime, and thus, must be submitted to the jury and proven beyond a reasonable doubt. However, that inquiry is not relevant to the deadly weapon enhancement. *Alleyne* dealt with factors that increased the mandatory minimum, but

DiValentino's case does not deal with a mandatory minimum; instead, we are dealing with a sentencing enhancement.

Generally, a judge may not increase automatically a defendant's sentence based on a preponderance of the evidence standard. **Commonwealth v. Valentine**, 101 A.3d 801, 804 (Pa. Super. 2014). For example, mandatory minimum sentencing statutes (like sentences for offense committed with firearms[15]) that do not pertain to prior convictions are constitutionally infirm insofar as they constrain the trial court to increase a defendant's mandatory minimum sentence based on a preponderance of the evidence standard. **Id.**

Here, however, the trial court did not impose a mandatory minimum. Rather, the trial court applied 204 Pa. Code § 303 to DiValentino's sentence, which states, in relevant part, as follows:

§ 303.9 Guideline sentence recommendation: general.

. . .

(b) *Deadly Weapon Enhancement sentence recommendations*. Except for those sentenced pursuant to 18 Pa.C.S.[A.] § 1102.1 (relating to sentence of persons under the age of 18 for murder, murder of an unborn child and murder of a law enforcement officer), if the court determines that an offender possessed a deadly weapon pursuant to § 303.10(a)(1), the court shall instead consider the DWE/Possessed Matrix (§ 303.17(a)).

. . .

§ 303.10. Guideline sentence recommendations: enhancements.

_____

[15] 42 Pa.C.S.A. § 9712.

(a) *Deadly Weapon Enhancement*.

(1) When the court determines that the offender possessed a deadly weapon during the commission of the current conviction offense, the court shall consider the DWE/Possessed Matrix (§ 303.17(a)). An offender has possessed a deadly weapon if any of the following were on the offender's person or within his immediate physical control:

(i) Any firearm, (as defined in 42. Pa.C.S.A. § 9712) whether loaded or unloaded[.]

204 Pa. Code § 303.9(b) and 303.10(a)(1)(i). In ***Commonwealth v. Buterbaugh***, 91 A.3d 1247 (Pa. Super. 2014), this Court aptly summarized the utility of section 303, stating:

The [Deadly Weapons Enhancement] provision of the Sentencing Guidelines provides that when the court determines that the defendant possessed a deadly weapon during the commission of a criminal offense, the court must add at least 12 months and up to 24 months to the guideline sentence that would otherwise have been applicable.

***Id.*** at 1268.

As the above demonstrates, section 303 of the Sentencing Code is distinct from section 9712; where the deadly weapon sentencing enhancement applies, the trial court is required only to raise the standard guideline range, and thus, it retains discretion to sentence outside the guideline range. ***Id.*** at n.10 ("If the enhancement applies, the sentencing court is required to raise the standard guideline range; however, the court retains the discretion to sentence outside the guideline range."). Therefore,

application of the sentencing enhancement does not violate the holding in ***Alleyne***.

Accordingly, the trial court's application of section 303 of the Sentencing Code does not implicate the legality of DiValentino's sentence, but rather, the discretionary aspects of his sentence, from which there is no appeal of right. ***See Commonwealth v. McAfee***, 849 A.2d 270, 274 (Pa. Super. 2004); ***see Commonwealth v. Brougher***, 978 A.2d 373, 376 (Pa. Super. 2009) (application of the deadly weapons enhancement implicates sentencing court's discretion once it imposes sentence following determination of the adjusted sentencing guideline range). Instantly, DiValentino has failed to comply with any of the procedural dictates necessary to invoke our jurisdiction to review his discretionary aspects of sentence claim. ***Commonwealth v. Evans***, 901 A.2d 528, 533 (Pa. Super. 2006) (internal citations omitted). Therefore, we find this issue waived.

Judgments of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/13/18</u>

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : Nos. 792 CRIMINAL 2010 |
| | :      840 CRIMINAL 2010 |
| v. | : |
| | : Appeal Docket Nos. |
| ANTHONY J. DIVALENTINO, | :     787 EDA 2017 |
| | :     788 EDA 2017 |
| Defendant | : |

## OPINION IN SUPPORT OF ORDER PURSUANT TO Pa. R.A.P. 1925(a)

Following the denial of his post sentence motions, Defendant filed appeals from the judgments of sentence entered after a jury convicted him of multiple felony and misdemeanor offenses. On receipt of the appeals, we issued orders directing Defendant to file statements of errors complained of on appeal pursuant to Pa. R.A.P. 1925(b). Defendant complied, assigning the following errors:

> 1. The trial court erred in denying Mr. Valentino's right to a speedy trial pursuant to Pa.R.C[rim].P. 600 and all procedural requirements of the Interstate Agreement on Detainers.
>
> 2. The trial court erred in allowing the Commonwealth to introduce evidence of "prior bad acts" under Pa. R.E. 404(b), acts which occurred both prior to and after the events giving rise to the instant charges. The "prior bad acts" which took place in New York State were not relevant, and, if deemed relevant, any probative value this evidence may hold was far outweighed by its prejudicial effect. This evidence was improperly admitted at trial and improperly considered by the Court at sentencing, amounting to a violation of the Due Process right to a fair trial as applied to the Commonwealth of Pennsylvania through the Fourteenth Amendment of the United States Constitution.
>
> 3. The trial court erred in allowing the Commonwealth to introduce testimonial hearsay in the form of an audio-recording of a jailhouse informant in violation of the Confrontation Clause in the Sixth Amendment of the United States Constitution, Article 1, § 9 of the Pennsylvania Constitution, and the intertwined Due Process right to a fair trial.

4. The trial court erred in denying defendant's supplemental post-sentence motion in arrest of judgment in that insufficient evidence was produced to establish the "place of isolation" element of the kidnapping charges beyond a reasonable doubt.

5. The trial court erred in applying the Deadly Weapon Used Enhancement when the jury acquitted defendant of possession of an instrument of crime and when there was insufficient evidence to establish by a preponderance of the evidence that defendant visibly possessed a firearm in the commission of a crime.

(Defendant's Rule 1925(b) Statements, filed April 3, 2017, ¶¶ 1-5). For the reasons that follow, we believe that Defendant's assignments of error lack merit and the judgments of sentence should be affirmed.

## Background

As discussed in more detail below, we previously heard and rejected most of the issues Defendant raises in these appeals. We did so through orders, on-record rulings, and hearing addenda that articulated our reasoning and summarized the law on which we relied. For the most part, those orders, rulings, and addenda, for which record citations will be given, suffice to address and dispel Defendant's assignments of error. Nonetheless, to supplement the rationale we previously expressed, to put our rulings and Defendant's issues in context, and to discuss the one new issue Defendant raised on appeal, we provide the following:

On March 21, 2010, Defendant struck Ann Marie Andrews, his paramour with whom he lived, with a shoe and repeatedly hit her with open and closed fists. As a result, Defendant was arrested and charged in case 792 with simple assault and harassment. He spent a short time in jail and then made bail.

2

Between the date of the assault and the scheduled preliminary hearing, Defendant continuously called Ms. Andrews to annoy and threaten her and tell her not to testify. The day before the preliminary hearing Defendant escalated by showing up at Ms. Andrews' place of work to try to convince her not to testify.

On April 22, 2010, the day of the preliminary hearing, Defendant woke Ms. Andrews at 5:00 a.m. by placing a shotgun to her back. He held her at gunpoint in her bed for more than an hour. During the episode, Defendant threatened Ms. Andrews and said and did many things designed to intimidate and keep her from testifying. For example, Defendant told Ms. Andrews that he had test fired the shotgun into a pillow in order to confirm that the blast would not be heard when he killed her. In addition, Defendant said point blank that he would not go back to jail because his life would be over if he did. And, Defendant told Ms. Andrews several times that if she moved, he would shoot her. Ms. Andrews' teenage daughter was in the home during the episode.

Ms. Andrews was eventually able to convince Defendant to allow her to take her daughter to school. After leaving the home, Ms. Andrews went immediately to the police station to report the incident. While she was outside the station, Defendant showed up and pleaded with her not to testify against him. After Defendant left, Ms. Andrew told the police what he had done that morning.

As a result of the second incident, Defendant was arrested and charged in case 840 with two counts of Kidnapping, Intimidation of a Witness, two counts of Retaliation Against a Witness, Terroristic Threats, Unlawful Restraint, Coercion/ Threat to Commit a Crime, Stalking, Possession of the Instrument of a Crime, Simple Assault, Recklessly Endangering Another Purpose, False Imprisonment, and Harassment. He spent almost two months in jail before making bail.

3

Subsequently, both cases were waived to court. On June 10, 2010, Defendant posted bail. As a specific condition of bail, Defendant was to have "no contact at all with the victim."

On June 14, 2010, only four days after he was released on bail, Defendant literally ran Ms. Andrews off the road on Interstate Route 84 in New York while she was driving to work. He caused a serious crash in which Ms. Andrews was injured and had to be extricated from her car by the Jaws of Life. The incident was witnessed by several motorists. Defendant left the scene and, when approached by police, cut his wrists in an apparent attempt to kill himself.

Defendant was arrested, charged with felony crimes, including Attempted Murder, and incarcerated in New York. He has been incarcerated ever since.

While in jail, Defendant solicited another inmate to kill, or to find someone to kill, Ms. Andrews. As a result of the solicitation, he was charged in a second case with felony crimes, including conspiracy and solicitation to commit murder.

The proceedings in New York took more than five years to complete. Initially, Defendant pled guilty in both cases. However, prior to sentencing, he moved to withdraw his plea. The trial court denied the motion and Defendant appealed. The appellate court in New York court reversed and remanded the cases for trial.

Ultimately, on February 27, 2015, Defendant was tried and convicted of multiple felony charges, including Conspiracy and Assault with Intent to Cause Serious Injury with a Weapon, as well as several lower graded offenses. On March 30, 2015, he was sentenced to incarceration of 21 to 35 years.

During the five years that Defendant was incarcerated in New York while his cases there were being litigated, the Commonwealth maintained regular contact with

4

the New York prosecutors and penal authorities. The Commonwealth made several attempts, through both the Interstate Act on Detainers ("IAD"), 42 Pa. C.S.A. Section 9101 *et. seq.*, and a Governor's Warrant procedure, to bring Defendant to this Commonwealth to try him on the Pennsylvania charges. However, New York would not release him.

After he was sentenced in New York, Defendant became available. At first, Defendant contested extradition. However, on September 11, 2015, he reversed course and waived extradition. Thereafter, the required IAD paperwork was signed and mailed by New York to Pennsylvania. On October 7, 2015, Defendant was transported to the Monroe County Correctional Facility. He remained in Monroe County until after the proceedings on his post sentence motions were concluded.

The facts, circumstances, and time frames pertaining to the Commonwealth's attempts to bring Defendant to Pennsylvania, as well as hi ultimate extradition, were chronicled during the hearing held before this Court on May 27, 2016. (N.T., 5/27/2016, pp. 32-69, 90, 92-95, 103-04, and Exhibits 1 – 21). The relevant facts and time frames were also discussed during the subsequent hearing at which we denied Defendant's motion to dismiss under Pa. R.Crim.P. 600 and the IAD. (N.T., 6/21/2016, pp. 9-19 and Addendum), as well as the hearing on Defendant's post sentence motions (N.T., 2/1/2017, pp. 21-28 and Addendum 1).

In May of 2015, before Defendant waived extradition, the Commonwealth filed a notice pursuant to Pa.R.E. 404(b) of its intent to introduce "other acts" evidence consisting of Defendant's acts, conduct, and statements in New York. In response, Defendant filed a motion objecting to and seeking preclusion of the other acts evidence. The Commonwealth then filed a petition asking the Court to dismiss

5

Defendant's motion until Defendant was returned to Pennsylvania. We convened a hearing on the competing motions at the end of which we entered an order holding the motions in abeyance until such time as Defendant was extradited.

After Defendant was extradited, a series of motions were filed and several hearings were held. In broad summary, but of significance to the issues raised on appeal:

On November 13, 2015, we convened a hearing to address the 404(b) evidence issues. Through both oral proffers and a variety of exhibits, the Commonwealth fleshed out the specific evidence it sought to introduce, which essentially reduced to: 1) Defendant's acts toward Ms. Andrews and the statements he made in New York, including both the road rage incident and Defendant's attempt to hire someone to kill Ms. Andrews, and the New York convictions; and 2) Defendant's assaults and abuse of Ms. Andrews prior to and as part of the these cases. At the conclusion of the hearing, we issued a briefing schedule and set the case for trial. (N.T., 11/13/2015, pp. 2-35 and Exhibits 1-11).

In January of 2016, while the other acts evidence issues were pending, Defendant asked for and was granted a trial continuance, and the Commonwealth filed another Rule 404(b) notice. The second notice advised of the Commonwealth's intent to introduce evidence of prior domestic violence and assaultive conduct by Defendant against Ms. Andrews, mistreatment of a family pet, and related matters, based on a written summary from Ms. Andrews' daughter, who was now an adult.

At that point, the parties asked for a scheduling conference to discuss dates for trial as well as hearings on the remaining Rule 404(b) issues and additional motions counsel for Defendant planned to file. Following the conference, we scheduled trial for

6

a date certain in June and set a hearing for the end of March to address the remaining Rule 404(b) issues and the anticipated defense motions.

On February 24, 2016, we issued a comprehensive order denying Defendant's objections to the other acts evidence referenced in the Commonwealth's first Rule 404(b) notice and discussed during the November 13, 2015 hearing. In the order, we summarized the evidence the Commonwealth sought to introduce, articulated the reasons for our decision, and cited the law on which we relied. (Order dated February 24, 2016). For convenience and ease of reference, a copy of the order is attached as Appendix A. We incorporate the order into this opinion by reference.

On March 28, 2016, we convened the hearing planned during the scheduling conference. Immediately prior to the hearing, Defendant filed objections to the Commonwealth's second Rule 404(b) notice and motions seeking various other forms of relief. Due to the late filings, we recessed the hearing and set a deadline for the filing of any additional motions.

Subsequently, Defendant serially filed several motions. The additional filings included motions to dismiss both cases pursuant to Rule 600 and the IAD.

The hearing on Defendants motions and objections was ultimately re-convened on May 27, 2016. While all filings were addressed, the motions to dismiss were a major focus of the hearing. On the dismissal issue, the Commonwealth called Carol Doss, the office manager and person assigned to handle the logistics of extraditions, governors' warrants, and IAD matters for the Monroe County District Attorney's Office, and submitted 21 exhibits. In sum, the evidence presented by the Commonwealth detailed its efforts to obtain Defendant over the years while the New York cases were proceeding. The evidence also framed and fleshed out the relevant time frames for

7

Rule 600 and IAD analyses. (N.T., 5/27/2016, pp. 32-69, 90, 92-95, 103-04, and Exhibits 1 – 21; Order dated May 27, 2016).

At the conclusion of the hearing, we denied several motions, gave the parties time to brief the Rule 600 and IAD issues, and, for the most part, deferred ruling on the other acts evidence referenced in the Commonwealth's second Rule 404(b) notice until time of trial. (N.T., 5/27/2016, pp. 103-04, 108-111; Order dated May 27, 2016). As to the 404(b) evidence, we gave the parties some guidance and the benefit of our initial assessment based on the pre-trial proffers, and ruled generally that we would not allow evidence of other acts that had no temporal connection to the crimes charged; however, we indicated that a definitive ruling would need to await trial, at which time the evidence would guide and provide context for not only legal analysis, but also, the required balancing of probative value and prejudice. (N.T., 5/27/2016, pp. 18-25 and 104-06; Order dated May 27, 2016. (See N.T., 6/21/2016, pp. 7-8). See generally Commonwealth v. Hicks, 91 A.3d 47, 54 (Pa. 2014) (holding that the balancing of probative value and prejudice is generally better left for trial, but may be appropriate in some pretrial situations). We incorporate our on-record statements and reasoning into this opinion by reference.

On June 21, 2016, prior to commencement of the evidentiary portion of trial and outside the presence of the jury, we issued an order denying Defendant's motions to dismiss under Rule 600 and the IAD. We stated our reasoning, including applicable time calculations, on the record and handed out a hearing addendum that summarized the law on which we relied. (N.T., 6/21/2016, pp. 9-19 and Addendum). For convenience and ease of reference, a copy of the addendum is attached to this

8

opinion as Appendix B. We incorporate the Addendum and our on-record statements into this opinion by reference.

During trial, the Commonwealth called numerous witnesses and submitted 14 exhibits. It presented prior and subsequent other acts evidence. Specifically, it presented the evidence we ruled pre-trial that it could introduce, as well as additional other acts evidence that was admitted based on the record developed at trial. This included evidence that was presented in response to Defendant's testimony, given against the advice of counsel, that he had no prior record and had not previously been abusive towards Ms. Andrews or other women. While a substantial amount of other acts evidence was admitted, most of the other acts evidence was relevant and admissible for multiple purposes, quite a bit constituted direct evidence of several crimes charged, and some rebutted Defendant's testimony. Both during and after the evidentiary portion of trial, required limiting instructions were given. (N.T., 6/22/2016, pp. 29-30; N.T., 6/22/2016, pp. 87-88).

Also during the trial, the Commonwealth played portions of recorded conversations between Defendant and a jailhouse informant during which Defenant tried to hire a third party to kill Ms. Andrews so she would not be able to testify against him. (N.T., 6/22/2016, pp. 9-10; N.T., 6/21/2016, Exhibits 8-10). The recordings were played over the objections of Defendant's attorney which we overruled. (N.T., 6/22/2016, pp. 2-10. See N.T., 6.21/2016, pp. 2331-34).

The conversations were recorded through a wire consensually worn by the informant on two different occasions. Before playing the recordings, the Commonwealth called the New York State Police Investigator who arranged the intercepts. The investigator summarized the background leading up to the intercepts,

9

explained how the conversations were recorded, identified Defendant and the informant as the two persons involved in the conversations and whose voices were heard on the recordings, and authenticated both the recordings and transcripts of the recordings. The investigator testified that he placed the wire on the informant immediately before the conversations took place, that he listened to the conversations live through the intercept device, and that he watched the conversations in real time through the prison's video surveillance system. He also testified that the recordings accurately reflected what he saw and heard during the intercept operation. Finally, the investigator testified that Defendant's attempt to hire someone to kill Ms. Andrews led to the second New York prosecution, that the recordings were played during trial on those charges, and that Defendant was convicted of the charges by a jury. (N.T., 6/21/2016, pp. 234-57, 277 and Exhibits 8-11).

At the end of the trial, the jury convicted Defendant in case 792 of both offenses charged. In case 840, Defendant was found guilty of all crimes charged, except Possession of the Instrument of a Crime and Recklessly Endangering Another Person. After the verdicts were recorded, we issued orders scheduling a sentencing hearing and directing our Probation Office to prepare a Pre-Sentence Investigation ("PSI") report.

The sentencing hearing was convened, as scheduled, on August 30, 2016. At the conclusion of the hearing, we sentenced Defendant to incarceration of 15 to 30 years, plus 90 days, a sentence within the aggravated range, to be served consecutive to the sentence imposed in New York. We informed Defendant of the documents and information we considered in fashioning his sentence, including the evidence presented during pre-trial hearings and at trial, the PSI report, the statements made by

10

Defendant, his attorney, and the assistant district attorney, the sentencing guidelines, and the applicable law. In addition, we stated our reasons for the sentence on the record. (N.T., 8/30/2016. pp. 29-46; Orders dated August 30, 2016). We incorporate our on-record statements and reasoning into this opinion by reference.

The applicability of the deadly weapon enhancement, an issue involved in these appeals, was raised at the time of sentencing. Counsel for Defendant took the position that the enhancement could not, or at least should not, be applied because the jury had acquitted Defendant of the crime of Possession of the Instrument of a Crime. The assistant district attorney argued that the enhancement could and should be applied, and maintained that ample evidence had been presented to support its application. (N.T., 8/30/2016, pp. 2-5, 8-14, 18, and 27). After hearing the arguments, we applied the enhancement, finding that a deadly weapon was used in case 840. (Id. at 40-41).

Thereafter, through new counsel, Defendant filed timely post sentence motions which were subsequently amended, both orally and in writing. (N.T., 2/1/2017, pp. 3-5, 7-8). In his post sentence motions, Defendant raised four of the five allegations of error – the Rule 600/IAD ruling, the admission of other acts evidence, the sufficiency of the evidence regarding the Kidnapping charges, and the applicability of the deadly weapons enhancement – he raises in these appeals.

On February 1, 2017, after giving new counsel substantial time to request and obtain transcripts and file a supplemental motion and affording both parties ample time to submit briefs, we convened a hearing on Defendant's post sentence flings. During the hearing, we allowed further amendment of the motions. Counsel for Defendant presented oral argument. The assistant district attorney relied for the most part on his written brief. At the conclusion of the hearing, we denied all of Defendant's

11

motions. We stated our reasons on the record and handed out a hearing addendum that comprehensively summarized the law on which we relied. (N.T., 2/1/2017, pp. 5-6, 21-46 and Addendum 1; Order dated February 1, 2017).[1] For convenience and ease of reference, the addendum is attached to this opinion as Appendix C. We incorporate the addendum and our on-record statements into this opinion by reference.

Subsequently, Defendant filed the instant appeals.

### Discussion

1.   We Properly Denied Defendant's Motion to Dismiss Pursuant to Rule 600 and the IAD

In his first assignment of error, Defendant asserts that we erred by denying his motions to dismiss under Rule 600 and the IAD. Our reasons for denying the motions, including our time calculations, were explained in detail on the record on June 21, 2016, and the law we applied is summarized in the hearing addenda attached to this opinion as Appendices B and C. (N.T., 6/21/2016, pp. 9-19 and Addendum). Our reasoning was reiterated and amplified during the hearing on Defendant's post sentence motions. (N.T., 2/1/2017, pp. 21-28 and Addendum 1). Our prior on-record statements and the accompanying addenda adequately, properly, and fully address the first issue raised by Defendant. For the reasons we previously articulated, Defendant's first assignment of error lacks merit.

2.   We Properly Allowed Other Acts Evidence

In his second assignment of error, Defendant contends that we erred by allowing the Commonwealth to introduce Rule 404(b) other acts evidence at trial and

---

[1] Two addenda are attached to the transcript of the hearing on Defendant's post sentence motions. The first is the addendum attached hereto as Appendix C. The second addendum is the February 24, 2016 order that is Appendix A to this opinion.

12

by considering Defendant's prior and subsequent "bad acts" in imposing sentence. Neither aspect of this assignment of error has merit.

Part one of this assignment of error challenges our decision to allow introduction of other acts evidence at trial. While there is no question that other acts evidence was admitted during the trial, Defendant makes no attempt to specifically identify or cite in the record to particular evidence, or examples of the evidence, he challenges. Additionally, it is not clear whether Defendant is attempting to challenge only the other acts evidence relating to his criminal conduct (and attempted suicide) in New York or all other acts evidence. Regardless, he raises only a general, all-encompassing challenge that does not permit a specific or meaningful response. Due to the lack of clarity and the generality of the assignment of error, we believe that Defendant has waived this claim.

If this challenge will be heard, we can only respond generally to the overly broad claim that *all* other acts evidence was irrelevant or, in the alternative, unduly prejudicial. As to this generic assertion, our reasons for denying Defendant's objections to the Commonwealth's Rule 404(b) notices and allowing introduction of other acts evidence were explained in detail in: 1) the order we issued on February 24, 2016 (Appendix A); 2) our on-record statements during the May 27, 2016 hearing (N.T., 5/27/2016, pp. 18-25, 104-06); 3) the statements we made during the sentencing hearing (N.T., 8/30/2016, pp. 29-46); and 4) the amplified rationale we expressed during the hearing on Defendant's post sentence motions. (N.T., 2/1/2017, pp. 28-37). The law on which we relied is recited in the hearing addenda attached to this opinion as Appendices A and C. For the reasons we previously articulated,

13

Defendant's general challenge to the introduction of other acts evidence at trial does not hold water.

In succinct summary, and to highlight some of our on record remarks, the crimes Defendant committed against Ms. Andrews in both Pennsylvania and New York, the conduct leading up to those crimes, and the conduct occurring in-between and after those crimes, were in effect part of a single episode comprised of a continuous, inter-related series of escalating criminal incidents perpetrated against the same victim that grew more and aggressive and more serious as they unfolded over a relatively short period of time.[2] Defendant erred and violated the law by assaulting Ms. Andrews, compounded the error by attempting to harass and threaten her into not testifying, doubled-down by preventing her at gunpoint from testifying, and then parlayed his multiple criminal miscues first by trying to kill her himself and then, when he failed, attempting to hire someone to do it for him.

Given the facts and circumstances of this continuous, inter-connected episode, the "other acts" evidence that was introduced in the trial satisfied several of the enumerated "exceptions" and "purposes" for which other acts evidence is permitted under Pa. R.E. 404(b)(2), including motive, opportunity, intent, preparation, plan, and knowledge. Further, these cases are poster cases for the separate "res gestae" exception since Defendant's "prior bad acts," as well as his "subsequent bad acts," unquestionably provided context for and the complete story of the events surrounding the crimes charged in Pennsylvania and are part of the chain, sequence, and natural development of events that form the history of these cases, whether the cases are

---

[2] A total of 85 days elapsed between the March 21, 2010 assault in Pennsylvania and the June 14, 2010 incident in which Defendant ran Ms. Andrews of the road on Route 84 in New York. During this time, Defendant was incarcerated in Pennsylvania for at least 50 days. As noted, the Route 84 incident occurred only four days after Defendant was released on bail.

14

viewed individually, together, or as part of the continuing episode that concluded with Defendant's second arrest in New York. Clearly, the evidence was relevant, under both the legal and common meanings of that term, for these purposes.

The challenged evidence was also relevant and admissible for other reasons and purposes. Specifically, at least some of the evidence constituted direct evidence of one or more of the crimes charged, including Intimidation of a Witness, Retaliation Against a Witness or Victim, Stalking, Threat or Coercion to Commit a Crime, and Harassment. Along similar lines, these two cases were joined for trial without objection. Thus, direct evidence of the crimes charged in each case was properly admitted even though some of the direct evidence in one case might be considered to be "other acts evidence" as to the other case. In addition, evidence consisting of subsequent acts, including evidence of Defendant's criminal and self-injurious actions in New York, was relevant to show consciousness of guilt, flight, and attempt to eliminate a material witness.

In sum, Defendant's general, conclusory assertion that all of the Rule 404(b) other acts evidence was irrelevant does not hold water. At minimum, the evidence was relevant for at least the multiple purposes listed above.

The contention that the prejudicial impact of the evidence outweighed its probative value is equally without merit. There is no question that a substantial amount of other acts evidence was admitted. There is also no question that there was some prejudicial impact. However, as the cases cited in the hearing addenda indicated, we were not required to sanitize the trial to protect Defendant from his own conduct toward the victim. These are not cases in which the legitimacy, accuracy, or need for the evidence was questionable. Similarly, these are not cases where the

15

Commonwealth's strategy was to show that Defendant was a person of bad character by introducing evidence of unconnected bad acts against different persons that were separate from and had no temporal connection to the charges being tried. Rather, as discussed, the challenged evidence, whether viewed individually or as a whole, was relevant for *multiple legitimate* purposes, including in some instances as direct evidence of crimes charged; the evidence was fresh and part of a continuous, on-going, inter-connected episode of stalking, harassment, intimidation, threats, and physical assaults that was focused on a single victim over a short period of time, rather than acts that were unconnected and attenuated to the charges on trial; the evidence was necessary to provide context for the crimes charged and the history of these cases; and substantial evidence that Defendant committed the other acts was presented. Defendant's conduct toward and attempts to silence Ms. Andrews and settled rules of evidence, not an improperly motivated Commonwealth litigation strategy or theory of the case, brought about the evidence and made the evidence both relevant and necessary, especially as to case 840 in which there were no direct witnesses other than Ms. Andrews and Defendant. Further, some of the other acts evidence – evidence relating to prior bad acts including prior convictions and treatment of women – was admitted only as a result of, and in direct response to, Defendant taking the stand against his attorney's advice and lying about his past record. Finally, we gave required limiting instructions (N.T., 6/22/2016, pp. 29-30; N.T., 6/22/2016, pp. 87-88).

Weighing and balancing the relevance of the other acts evidence against its prejudicial impact under the particular facts and circumstances of these cases, we

16

found that the probative nature of the evidence outweighed the prejudice to Defendant. We stand behind that determination.

Part two of this assignment of error alleges that, in imposing sentence, we erred by considering Defendant's prior and subsequent bad acts. This assertion, which was first raised or at least implied at time of sentencing, merits little response and may be disposed of quickly. As we stated during the sentencing hearing in responding to statements made by Defendant and his attorney and in explaining the reasons for the sentence imposed:

> So regardless of the evidentiary merit or lack of merit in your mind of the other acts evidence, the other acts that you committed are certainly legitimate factors to consider in imposing sentence. In fact if I were not to consider the other acts that you committed against the same victim and your prior record in general I wouldn't be doing my job.

(N.T., 8/30/2016, p.34).

On a more academic and analytical level, sentencing is a matter within the sound discretion of the trial court. See *Commonwealth v. Walls*, 926 A.2d 957 (Pa. 2007). The court must impose a sentence that is "consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). See *Walls*, 926 A.2d at 967-68; *Commonwealth v. Dodge*, 957 A.2d 1198, 1200 (Pa. Super. 2008) ("*Dodge II*"), *appeal denied*, 980 A.2d 605 (Pa. 2009). Additionally, a court should consider the particular circumstance of the offense and the character of the defendant, and should refer to the defendant's prior criminal record, his age, personal characteristics and his potential for rehabilitation. *Commonwealth v. Moury*, 992 A.2d 162, 171 (Pa. Super. 2010) (citing *Commonwealth v. Griffin*, 804

17

A.2d 1, 10 (Pa. Super. 2002), *appeal denied*, 868 A.2d 1198 (Pa. 2005), *cert. den*, 545 U.S. 1148 (2005)).

The court determines whether aggravating circumstances exist. If aggravating circumstances are present, "the court may impose an aggravated sentence ...." 204 Pa. Code. § 303.13(a). A sentencing judge "has wide discretion in sentencing and can, on the appropriate record and for the appropriate reasons, consider any legal factor in imposing a sentence in the aggravated range." *Commonwealth v. Stewart*, 867 A.2d 589, 593 (Pa. Super. 2005) (citation omitted). *See also Commonwealth v. Duffy*, 491 A.2d 230, 233 (Pa. Super. 1985) (holding that a sentencing judge may consider any legal factor in deciding whether a defendant should be sentenced within the aggravated range). A sentencing judge may even consider uncharged criminal conduct for sentencing purposes.

> Not only does the case law authorize a sentencing court to consider unprosecuted criminal conduct, the sentencing guidelines essentially mandate such consideration when a prior record score inadequately reflects a defendant's criminal background.

*Commonwealth v. P.L.S.*, 894 A.2d 120, 131 (Pa. Super. 2006), *appeal denied*, 906 A.2d 542 (Pa. 2006). *See also* 204 Pa. Code §303.5(d).

At bar, Defendant's acts and conduct before, during, and after commission of the crimes charged related directly to many of the factors we were required to consider in imposing sentence, as well as other factors we were permitted to consider, including, but not limited to: the nature and gravity of the offenses; circumstances surrounding the offenses; impact on the victim; impact on the community/society; harm caused; public safety/community protection; number of people imperiled in the Route 84 incident; and Defendant's character, prior record, violent propensities, rehabilitative

18

prospects or lack thereof, amenability or lack of amenability to supervision, attitude towards and treatment of women, lack of restraint, and non-compliance with both laws and court orders. Additionally, some of the other acts were by themselves aggravating factors, while others were proper to consider in determining whether aggravating circumstances existed. This is especially true in these cases since Defendant's prior record score was woefully inadequate to reflect his criminal activity. As our on-record statements during the sentencing hearing demonstrate, we considered Defendant's other acts for these legitimate sentencing purposes and not, as Defendant has charged, to punish him for his conduct in New York or to deprive him of due process. (N.T., 8/30/2016, pp. 29-46). There was simply no error or abuse of discretion in considering Defendant's "other" acts and conduct when imposing sentence.

3. We Properly Allowed the Commonwealth to Play the Recording of the Consensual Wire Intercept

In his third assignment of error, Defendant claims that allowing the Commonwealth to introduce and play the recorded conversations in which he attempted to hire a third party to kill Ms. Andrews violated his Confrontation Rights. Specifically, Defendant contends that the audio of the jailhouse informant constitutes "testimonial hearsay" that is inadmissible under the Confrontation Clause, presumably because he did not have the opportunity to cross examine the informant. This constitutional challenge also lacks merit.

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court of the United States held that testimonial hearsay statements may not be introduced against a defendant, even if the statement falls into an established hearsay exception or has particularized indicia of reliability, unless the declarant is unavailable at trial and the defendant had a prior opportunity to confront and cross-examine the declarant. In

19

general, the rule applies only to "testimonial" hearsay that is used or intended to prove the truth of the matter asserted.

In cases decided after *Crawford* was announced, our Superior Court, the Third Circuit Court of Appeals, and district courts within the Third Circuit have addressed the argument raised by Defendant. The cases have consistently held that introduction of statements lawfully-obtained through a traditional wiretap does not violate the defendant's confrontation rights because the statements are *non*-testimonial, and therefore, not subject to the rule announced in *Crawford*. The cases have also consistently held that consensually-recorded conversations between a defendant and an informant of the type at issue here are constitutionally admissible. As to consensual intercepts, statements by defendants and co-conspirators are admissible because the statements are considered to be non-testimonial (and either not hearsay or statements that fall within a hearsay exception). Statements made by the informant, even if considered testimonial, are admissible and not violative of the defendant's confrontation rights because the statements are not introduced to prove the truth of the matter asserted, but rather, to provide context for the conversation, to put the conversation into perspective, and to make the conversation intelligible to the jury and the defendant's portion recognizable as admissions. *See Commonwealth v. Holton*, 906 A.2d 1246 (Pa. Super. 2006); *U.S. v. Berrios*, 676 F.3d 118 (3d Cir. 2012); *U.S. v. Hendricks*, 395 F.3d 173 (3d Cir. 2005); *U.S. v. Ligambi*, 891 F.Supp.2d 709 (E.D. Pa. 2012); *U.S. v. Estevez*, 2013 WL 3196421 (E.D. Pa., filed June 25, 2013).

*Hendricks* illustrates these holdings and provides an in-depth analysis of the confrontation issue raised by Defendant. In *Hendricks*, the Third Circuit interpreted the meaning of "testimonial evidence" under *Crawford* and assessed the distinction

20

between "testimonial" and "non-testimonial" statements in the context of both types of recorded conversations – traditional wiretap and consensual intercept – referenced above. Regarding evidence obtained through a traditional wiretap, the Third Circuit held that the intercepted statements were non-testimonial because they were surreptitiously recorded and unwittingly made. The Third Circuit found that the statements were more akin to remarks casually made to an acquaintance than formal statements made by a person who intends to bear witness, that the recorded statements did not fall within and were not analogous to the specific examples of "testimonial" statements given in Crawford, and, similarly, that the statements did not fall within the core category of ex parte testimonial statements that the High Court was concerned with in Crawford. Since the statements were non-testimonial, their introduction did not violate either the defendant's confrontation rights or the Crawford rule. Hendricks, 395 F.3d at 181-83.

As to consensual recordings made by an informant, the Third Circuit concluded that the party admission and co-conspirator portions of the intercept were not testimonial, and therefore, admissible. With respect to the statements of the confidential informant, the Third Circuit saw no need to reach the issue of whether the informant's statements were testimonial or non-testimonial. Instead, the Third Circuit held that the government should be permitted to introduce the informant's statements to provide context for the intercepted conversations and to put the conversations "into perspective and make them intelligible to the jury and recognizable as admissions." Id. at 184 (internal citations and quotations omitted). The court held that, when the defendant or his co-conspirator makes a statement as part of a "reciprocal and integrated conversation with a government informant" that is consensually recorded,

21

"the Confrontation Clause does not bar the introduction of the informant's portions of the conversation as are reasonably required to place the defendant or co-conspirator's statements into context." *Id.* See *U.S. v. Ligambi, supra; U.S. v. Estevez, supra.* The basis of this holding is that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 183 (quoting *Crawford*, 541 U.S. at 47).

In *Holton*, our Superior Court used the same basic rationale to find that statements made by a co-conspirator about the defendant's actions and statements that were captured though a wire worn by an undercover narcotics officer during a "buy-bust" operation were non-testimonial, and therefore, constitutionally admissible. Citing and discussing *Hendricks*, and interpreting *Crawford*, the Superior Court found that the informant was a co-conspirator, that the subject conversation was surreptitiously recorded, that the conversation did not fall within any of the examples of testimonial evidence given in *Crawford*, and that the informant's statements were unwittingly made without any indication that they would later be used for prosecutorial purposes. *Holton*, 906 A.2d at 1254.

*Hendricks* and *Holton* were issued soon after *Crawford* was announced and before the High Court decided subsequent cases that clarified the *Crawford* rule. As a result, both courts continued to apply the Confrontation Clause to non-testimonial hearsay through the indicia of reliability test established in *Ohio v. Roberts*, 448 U.S. 56 (1980), which decision was partially abrogated by *Crawford*. However, in subsequent decisions:

> the Court overruled *Roberts* in its entirety, holding without qualification that the Confrontation Clause protects the defendant *only* against the introduction of testimonial hearsay statements, and that admissibility of nontestimonial hearsay is

22

governed solely by the rules of evidence. *See Davis v. Washington*, 547 U.S. 813, 823–24, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (holding that, under *Crawford*, the Confrontation Clause protects only against admission of testimonial hearsay, because "a limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter"); *Michigan v. Bryant*, —— U.S. ——, 131 S.Ct. 1143, 1152–53, 179 L.Ed.2d 93 (2011) (confirming that *Crawford* limits the reach of the Confrontation Clause to testimonial statements); *Whorton v. Bockting*, 549 U.S. 406, 419–20, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007) ("Under *Crawford*, ... the Confrontation Clause has no application to [out-of-court nontestimonial statements] and therefore permits their admission even if they lack indicia of reliability.").

*Hendricks*, 676 F.3d at 126. Accordingly, where non-testimonial hearsay is concerned "the Confrontation Clause has no role to play in determining the admissibility of a declarant's statement [and] the 'indicia of reliability' test of *Roberts* is no longer an appropriate vehicle for challenging admission of nontestimonial hearsay." *Id.* (footnotes omitted).

In this case, it is unclear whether Defendant is challenging the entire recording, including his own statements, or just the statements of the informant. To the extent he is challenging his own statements, it is clear that the statements are constitutionally admissible.

Defendant's portion of the recording are comprised of the statements of a party – party admissions and statements against interest. As such, they are not hearsay, or, in the alternative, clear examples of exceptions to the hearsay rule. This is especially true since the statements were made during a conversation in which Defendant was conspiring or attempting to conspire with the informant to hire a hit man to kill Ms. Andrews. Additionally, under the law cited above Defendant's statements are clearly non-testimonial, and therefore, the Confrontation Clause does not prohibit their

23

admission. In this regard, Defendant's statements were statements of a conspirator to his co-conspirator in furtherance of the conspiracy, were unwittingly made and surreptitiously recorded, were party admissions, were not anticipated to be used in a later criminal prosecution, and do not fall within the core category of *ex parte* testimonial statements that the High Court was concerned with in *Crawford*.

The informant's statements are also constitutionally admissible. Since the informant himself was a conspirator speaking to his co-conspirator in furtherance of the conspiracy, his statements were non-testimonial. Alternatively, even if the statements are deemed to be testimonial, they were not admitted for the truth of what the informant said. Instead, as in *Hendricks*, *Ligambi*, and *Estevez*, the statements were part of a "reciprocal and integrated conversation" with Defendant that were introduced to provide "context" and "perspective" for the conversation and make Defendant's portion of the conversation "intelligible to the jury and recognizable as admissions." Indeed, the informant's statements in the cases at bar present a clearer example of constitutionally admissible informant statements than those involved in the cases cited above since, as noted, the informant in these cases was himself a conspirator who had direct conversations with Defendant, his co-conspirator, and was not, as in the cited cases, a third party who was part of multi-person dialog.

Under these circumstances and the law cited above, the Confrontation Clause did not bar introduction of the consensual recordings played at trial. Accordingly, Defendant's constitutional challenge – the only evidentiary challenge raised as to the intercepted conversation – fails.

24

4.    The Evidence Presented at Trial Was Sufficient to Sustain the Kidnapping Convictions

In his fourth assignment of error, Defendant contends that we erred by denying his motion for an arrest of judgement on the Kidnapping charges because, in his view, the evidence was insufficient to establish the "place of isolation" element of Kidnapping. Our reasons for denying the motion and finding that sufficient evidence was presented to sustain the convictions were explained during the hearing on Defendant's post sentence motions, and the standards and law we applied were recited in the hearing addendum that is attached to this opinion as Appendix C. (N.T., 2/1/2017, pp. 37-39 and Addendum). Our prior on-record statements and the accompanying addendum adequately, properly, and fully address Defendant's fourth assignment of error. For the reasons we previously articulated, this assignment of error lacks merit.

5.    We Properly Applied the Deadly Weapon Enhancement

In his fifth and final assignment of error, Defendant asserts that, in imposing sentence, we erred by applying the deadly weapon enhancement. Our finding that Defendant used a deadly weapon – a gun – was made during the sentencing hearing (N.T., 8/30/2016, pp. 40-41), our reasons for applying the enhancement and for rejecting Defendant's argument were expanded on during the hearing on Defendant's post sentence motions, and the law we applied is summarized in the hearing addendum that is attached to this opinion as Appendix C. (N.T., 2/1/2017, pp. 39-40 and Addendum). Our prior on-record statements and the accompanying addendum adequately, properly, and fully address Defendant's fifth assignment of error. For the reasons we previously articulated, this assignment of error, like the others, lacks merit.

25

For these reasons, we believe that the judgments of sentence should be affirmed.

BY THE COURT:

_____
Jonathan Mark, Judge

cc:     Superior Court of Pennsylvania
        Jonathan Mark, J.
        District Attorney (MTR)
        Eleanor M. Breslin, Esq.

26